[Nos. 40157-6-II; 40167-3-II;    Division Two.    June 1, 2011.]
40177-1-II; 40187-8-II.

*In the Matter of the Dependency of* D.C.-M. ET AL.

---

*Eric J. Nielsen* and *Eric Broman* (of *Nielsen, Broman & Koch PLLC*), for petitioner.

*Robert M. McKenna, Attorney General*, and *Jon R. Morrone, Assistant*, for respondent.

¶1 Van Deren, J. — KM[1] seeks review of a 2009 Pierce County Juvenile Court order directing her to participate in a psychosexual evaluation as part of the dependency proceedings involving her four daughters, DC-M, JW-M, JM-M, and HM-M, who were ages eight, six, three, and one, respectively, when the order was entered. KM argues that (1) the juvenile court lacks authority to order a psychosexual evaluation, (2) the order violates her due process rights, and (3) the order infringes on her constitutional privacy rights. We hold that juvenile courts have inherent authority to order psychosexual evaluations in dependency cases if sufficient evidence supports it. But here, because sufficient evidence does not support the juvenile court's order and the order is not clear about whether a compulsory polygraph examination is part of the evaluation ordered, we vacate the order for the evaluation and remand for further proceedings that will allow the parties and the juvenile court to examine and determine whether the necessary evidentiary basis exists for any such order as well as the exact scope of any ordered psychosexual evaluation.

## FACTS

¶2 The Washington State Department of Social and Health Services (DSHS) became involved with KM and her children following an April 2008 referral to Child Protective Services (CPS) when DC-M attended school with a black eye. A CPS worker interviewed DC-M at school that day, and DC-M stated that her mother had hit her with a belt. Law enforcement officials placed all four children in protective custody. "This referral was founded[2] for physical abuse by the mother." Clerk's Papers (CP) at 4 (capitalization omit-

---

[1] We identify the parties by their initials to protect the children's privacy.

[2] " 'Founded' means the determination following an investigation by CPS that based on available information it is more likely than not that child abuse or neglect did occur." WAC 388-15-005 (boldface omitted). " 'Unfounded' means the determination following an investigation by CPS that based on available information it is more likely than not that child abuse or neglect did not occur or there is insufficient evidence for the department to determine whether the alleged abuse did or did not occur." WAC 388-15-005 (boldface omitted).

ted). The parents would not agree to sign a voluntary placement agreement, but, on May 5, DSHS established, and the parents agreed to, a safety plan that allowed the children to return to KM's care. On May 21, after DC-M alleged additional instances of physical abuse, DSHS placed the children in protective custody and filed a dependency petition on May 23 and, on June 16, the juvenile court placed the children in DSHS's temporary custody.

¶3  In August 2008, the juvenile court entered an agreed dependency order, transitioning the children back into KM's home by the end of August and ordering KM to (1) participate in a full psychological evaluation with a parenting assessment component; (2) participate in a domestic violence assessment; (3) demonstrate her ability to maintain a safe, stable, protective home for a consistent period of time; and (4) engage in a medication management assessment.

¶4  But on August 20, DSHS filed a motion for order modifying the reunification plan based on KM's overuse and misuse of prescription medications and driving a car without a license or insurance. On September 8, the juvenile court modified the reunification plan and ordered that "[t]he above mentioned children are to remain out of home pending further court order." CP at 156.

¶5  On December 31, 2008, DSHS received a referral that DC-M and JW-M had disclosed sexual abuse by KM and their father, DM. A social worker interviewed the children, and JW-M and DC-M provided detailed descriptions of sexual assaults by KM and DM. On January 14, 2009, the juvenile court temporarily suspended KM and DM's visitation with the children.

¶6  At an April review hearing, DSHS reported that KM had fully complied with all court ordered services but that she had made no progress toward correcting her alleged parental deficiencies. The children's guardian ad litem (GAL) reported that KM appeared to be in compliance but would reserve on progress. DSHS also reported that its investigation had found that the children's allegations of sexual abuse by KM and DM were unfounded and law

enforcement would not pursue criminal charges against KM and DM because "so much reasonable doubt" surrounded the disclosures. Report of Proceedings (RP) (Apr. 3, 2009) at 9. Despite DSHS's unfounded determination, DSHS remained concerned about the children's sexual abuse allegations and their assertions that KM gave them cocaine and pills.

¶7 At the April review hearing, DSHS made its first request for an order requiring KM and DM to participate in psychosexual evaluations to help determine whether future unsupervised visits or reunification was appropriate. The GAL felt that the allegations of sexual abuse warranted a psychosexual evaluation. KM opposed the evaluation.

¶8 DSHS represented that the two older children did not want to visit their parents. DSHS stated that the children were not exhibiting any sexualized behavior. At the hearing, KM's brother, who served as a visitation supervisor from November to December 2008, testified that he supervised four or five visits and that the children seemed happy.

¶9 The juvenile court did not change the visitation schedule because it had been set by another judge and the court felt it did not have enough information to make a determination. The juvenile court also did not order a psychosexual evaluation because it was premature and would implicate the parents' Fifth Amendment rights under the United States Constitution. The juvenile court then ordered an accelerated three month review hearing "to make sure that things [were] moving ahead." RP (Apr. 3, 2009) at 55. On April 24, the juvenile court set a new visitation schedule for the parents.

¶10 In August 2009, after CPS received another referral based on new sexual abuse disclosures, DSHS moved to suspend KM's visits with the children. DSHS argued the visits should be suspended until law enforcement officials concluded their investigation. The new allegations arose from the two older children even though they had not visited KM for some time. On August 13, JM-M, one of the younger children, disclosed that KM "tickle[d] her pee-pee,"

but JM-M showed no visible signs of abuse. CP at 241. DC-M also described the "tickling," KM's "long fingernails, and [how] her mother would spread her pee-pee." RP (Aug. 26, 2009) at 24. DSHS mentioned that although it was not presently before the court, "the only way to resolve [the truthfulness of the allegations] sometime down the road [wa]s to do psychosexual evaluations on the parents, to have them hooked up to a lie detector and say whether or not they did this." RP (Aug. 26, 2009) at 26. KM asked the juvenile court to set up parameters for supervised visitation, instead of suspending her visitation with JW-M, because it was clear JW-M wanted to see her mother.

¶11 The juvenile court denied DSHS's motion to suspend KM's visitation with her children but ordered that the visitations occur in a therapeutic setting. The juvenile court noted it would be open to additional professionally supervised visits but would wait for the therapist's recommendation to ensure it would be in the children's best interest. The juvenile court specified that neither parent should be alone with any of the children in the bathroom.

¶12 At a December 2009 review hearing, the juvenile court considered DSHS's psychosexual evaluation request. DSHS reported, again, that the children's August 2009 sexual abuse allegations were determined to be unfounded and that the State decided not to file criminal charges. DSHS argued that the basis for the evaluation was to determine "the full extent of the allegations, whether they're true or not." RP (Dec. 15, 2009) at 42. DSHS stated that whether the evaluation would affect criminal charges was moot because "there [are] no criminal charge[s] facing the parents today." RP (Dec. 15, 2009) at 42. Moreover, despite KM and DM's compliance and progress with court ordered services, DSHS informed the juvenile court that it filed a termination petition because "the kids have been out of the home for more than 15 months." RP (Dec. 15, 2009) at 42.

¶13 KM opposed the psychosexual evaluation because (1) the statute of limitations on potential criminal charges had not run, (2) the parents' Fifth Amendment rights were

still implicated, (3) DSHS was engaged in a fishing expedition, and (4) DSHS's investigations into the sexual abuse allegations had resulted in a finding that the allegations were unfounded. KM also questioned DSHS's reasons for keeping the children away from their parents and for causing unnecessary delays in the proceedings. KM expressed concern that DSHS stated DC-M and JW-M did not want to see her when, actually, JW-M had expressed that she wanted to see her mother and, after only one therapy session, DC-M also wanted to see KM.

¶14 Esther Patrick, a therapist and visitation facilitator, recommended that KM participate in counseling with DC-M and a sexual assault trauma therapist. The juvenile court asked Patrick whether a psychosexual evaluation would assist an appointed sexual assault therapist, to which Patrick responded that she lacked expertise in that area, but she believed it would be "another tool that c[ould] be used to determine whether or not this . . . actually happened." RP (Dec. 15, 2009) at 56-57. KM again objected to any psychosexual evaluation that included a polygraph component because it would put her Fifth Amendment rights in jeopardy. KM's counsel indicated that "[i]f the issue is for her to get into therapy, that's not a problem. We will do that. My issue is doing a psychosexual evaluation itself." RP (Dec. 15, 2009) at 58.

¶15 The juvenile court ordered KM to participate in a psychosexual evaluation. The juvenile court described its decision as "a choice . . . between risking something and participating or being unwilling to take that risk and thereby potentially losing the opportunity to participate in appropriate services that will reunify the family." RP (Dec. 15, 2009) at 63. It noted that it was focusing on the children's best interests and "[w]hen they're able to verbalize a threat of harm that has occurred to them, [the court] ha[s] to get to the bottom of [the allegations] because, either way, they need therapy and help, and [the court] can't give them the right kind of therapy and help until [it] know[s]."

RP (Dec. 15, 2009) at 64. Additionally, the juvenile court found that "three children independently reporting sexual abuse by the mother is grounds to order a psychosexual evaluation regardless of no charges filed by prosecutor and unfounded CPS findings." CP at 329. KM sought discretionary review of the juvenile court's December 15 order, which we granted.

## ANALYSIS

¶16 KM contends that the juvenile court acted without authority when it ordered her to participate in a psychosexual examination. She argues that DSHS failed to make an adequate evidentiary showing to justify the order and that the juvenile court improperly based its determination on unfounded sexual abuse allegations. In her reply brief, KM argues that the psychosexual examination is not a "service" under RCW 13.34.138(2)(c). Reply Br. of Pet'r at 1. We agree that the record is insufficient to support the juvenile court's order requiring a psychosexual evaluation because (1) the order relies solely on the children's allegations, which DSHS ruled were unfounded, and (2) there was no evidence before the court sufficient to show its usefulness as a service to reunify this family. Furthermore, the order does not address whether a compulsory polygraph examination, which may violate KM's Fifth Amendment rights, is a required part of the psychosexual evaluation.[3]

### I. The Juvenile Court's Authority To Order Psychosexual Evaluations

¶17 KM argues that the legislature has not granted juvenile courts the power to order psychosexual evaluations that rely on polygraph examinations. To support this argument, she relies on our Supreme Court's opinion in *In re Detention of Hawkins*, 169 Wn.2d 796, 238 P.3d 1175 (2010), a sexually violent predator (SVP) case.

---

[3] Because we vacate the order and remand for further proceedings, we do not address KM's arguments that the trial court's order violated her substantive and procedural due process and privacy rights.

## A. Standard of Review

■ ■ ¶18 The juvenile court has broad discretion in dealing with matters of child welfare, and we review orders issued in dependency cases for an abuse of discretion. *In re Dependency of J.R.U.-S.*, 126 Wn. App. 786, 792 n.1, 110 P.3d 773 (2005); *In re Marriage of Cabalquinto*, 100 Wn.2d 325, 327, 669 P.2d 886 (1983). The juvenile court "abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds." *In re Custody of S.H.B.*, 118 Wn. App. 71, 78-79, 74 P.3d 674 (2003), *aff'd sub nom. In re Custody of Brown*, 153 Wn.2d 646, 105 P.3d 991 (2005).

## B. Services

■ ¶19 As a threshold matter, the parties dispute whether chapter 13.34 RCW authorizes the juvenile court to order a psychosexual evaluation in dependency proceedings as a service aimed at reunification of the family. The dependency statutes provide a broad framework from which the juvenile court may order services to facilitate parent-child reunification. The policy stated in RCW 13.34.020, coupled with the statutory language in RCW 13.34.138, guides the juvenile court in determining appropriate services for a family and its members:

> The legislature declares that the family unit is a fundamental resource of American life which should be nurtured. Toward the continuance of this principle, the legislature declares that the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized. When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail. In making reasonable efforts under this chapter, the child's health and safety shall be the paramount concern. The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter.

RCW 13.34.020.

¶20 RCW 13.34.138(2)(c) directs the juvenile court to establish several factors when a child is dependent and is not returned home as part of its review process:

(i) Whether the supervising agency or the department is making reasonable efforts to provide services to the family and eliminate the need for placement of the child. If additional services, including housing assistance, are needed to facilitate the return of the child to the child's parents, the court shall order that reasonable services be offered specifying such services;

(ii) Whether there has been compliance with the case plan by the child, the child's parents, and the agency supervising the placement;

(iii) Whether progress has been made toward correcting the problems that necessitated the child's placement in out-of-home care;

(iv) Whether the services set forth in the case plan and the responsibilities of the parties need to be clarified or modified due to the availability of additional information or changed circumstances;

(v) Whether there is a continuing need for placement;

(vi) Whether a parent's homelessness or lack of suitable housing is a significant factor delaying permanency for the child by preventing the return of the child to the home of the child's parent and whether housing assistance should be provided by the department or supervising agency;

(vii) Whether the child is in an appropriate placement which adequately meets all physical, emotional, and educational needs;

(viii) Whether preference has been given to placement with the child's relatives if such placement is in the child's best interests;

(ix) Whether both in-state and, where appropriate, out-of-state placements have been considered;

(x) Whether the parents have visited the child and any reasons why visitation has not occurred or has been infrequent;

(xi) Whether terms of visitation need to be modified;

(xii) Whether the court-approved long-term permanent plan for the child remains the best plan for the child;

(xiii) Whether any additional court orders need to be made to move the case toward permanency; and

(xiv) The projected date by which the child will be returned home or other permanent plan of care will be implemented.

■ ¶21 "Preventive services," defined as "other reasonably available services, including housing assistance, capable of preventing the need for out-of-home placement while protecting the child," and "remedial services," defined as "individual, group, and family counseling; substance abuse treatment services; mental health services; assistance to address domestic violence; services designed to provide temporary child care and therapeutic services for families; and transportation to or from any of the above services and activities," express the scope of DSHS's obligation to offer assistance and the juvenile court's duty to ascertain whether all appropriate services are offered to a family. RCW 13.34.030(14), .025(2)(a).

■ ¶22 DSHS's provision of services also plays an important role in any later termination proceedings because DSHS is required to demonstrate that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d). Thus, we hold that the scope of services DSHS must offer and the juvenile court must sanction is broad enough to include a psychosexual evaluation attuned to the needs of an individual case.

## II. The Juvenile Court's Order

¶23 KM relies on our Supreme Court's decision and discussion about the use of polygraph examinations in *Hawkins*, 169 Wn.2d 796, to support her argument that without express statutory authority, the juvenile court cannot order the use of polygraph examinations. *Hawkins* involved an SVP commitment proceeding under chapter 71.09 RCW, in which the State obtained a trial court order compelling the alleged SVP to submit to a polygraph

examination about his sexual history as part of its routine evaluation process. 169 Wn.2d at 799. Our Supreme Court reversed the trial court's order, holding that RCW 71.09-.040(4),[4] which authorizes pretrial evaluations of the respondent in SVP proceedings, does not allow the State to compel the respondent to submit to a polygraph examination. *Hawkins*, 169 Wn.2d at 799. The Supreme Court stated that because the legislature is undoubtedly aware of the inherent problems with polygraph examinations, it is fair to infer that it intends to prohibit compulsory polygraph examinations unless it expressly provides for their use. *Hawkins*, 169 Wn.2d at 803. This holding does not impair the ability of evaluators to assess whether an individual is an SVP through a voluntary polygraph examination or through other means. *Hawkins*, 169 Wn.2d at 803.

¶24 DSHS argues that because *Hawkins* involved SVP commitment statutes under chapter 71.09 RCW and not the dependency statutes, it is inapplicable. Although a court order requiring a compulsory psychosexual examination in a dependency case may trigger the concerns addressed by our Supreme Court in *Hawkins*,[5] we need not resolve this issue because, here, the record is inadequate to support

---

[4] RCW 71.09.040 provides in relevant part:

(1) Upon the filing of a[n] [SVP] petition under RCW 71.09.030, the judge shall determine whether probable cause exists to believe that the person named in the petition is a[n] [SVP]. If such determination is made the judge shall direct that the person be taken into custody.

. . . .

(4) If the probable cause determination is made, the judge shall direct that the person be transferred to an appropriate facility for an evaluation as to whether the person is a[n] [SVP]. The evaluation shall be conducted by a person deemed to be professionally qualified to conduct such an examination pursuant to rules developed by the department of social and health services. In adopting such rules, the department of social and health services shall consult with the department of health and the department of corrections. In no event shall the person be released from confinement prior to trial. A witness called by either party shall be permitted to testify by telephone.

[5] Such concerns may arise if, as Patrick and DSHS apparently believed, the purpose of the evaluation is to assist in determining what had happened, a backwards focus more akin to a criminal investigation, which implicates Fifth Amendment rights, than a therapeutic tool. Here, DSHS's only explanation for why it continued to press for such an invasive evaluation when its own investigations and law enforcement's investigations cast doubt on the veracity of the

determinations that (1) the proposed psychosexual evaluation would be helpful in a therapy setting aimed at reunification of the family when investigations concluded that the children's allegations were unfounded and (2) a compulsory polygraph examination is a necessary part of the ordered psychosexual evaluation.

¶25 We conclude that the record is not clear that the juvenile court's order would affect KM's Fifth Amendment rights through a process intended to reunify the family, but the record fails to adequately support the juvenile court's order. The record shows that the order was based solely on the allegations of December 2008 and August 2009, which the police and DSHS determined to be unfounded; and DSHS offered no additional or new evidence to support those investigated allegations, and the juvenile court did not state how the examination would be a service that would assist the family with reunification under these circumstances. Furthermore, the record does not show the juvenile court's consideration of the children's therapist and KM's agreement that the better approach was to consult a sexual therapist who, after engaging with KM and DC-M for treatment, could then make recommendations about what testing, if any, would assist the identification of particular services aimed at reunification. Thus, the order was based on untenable grounds and the juvenile court abused its discretion. *See S.H.B.*, 118 Wn. App. at 78.

¶26 We vacate the order and remand to the juvenile court to determine (1) what underlying sexual abuse allegations serve as the basis for its determination that a psychosexual evaluation is necessary; (2) whether a psychosexual evaluation in this case is a necessary component of any counseling or other treatment services; (3) how the psychosexual evaluation would further the policy goals of reunification and the provision of appropriate services; and

children's allegations was that the examination would determine "the full extent of the allegations, whether they're true or not." RP (Dec. 15, 2009) at 42. This suggested use of the psychosexual evaluation does not support the goal of reunification and the provision of services, and the record contains no other evidence showing how it would meet those goals.

(4) whether a compulsory polygraph examination is an essential component of any such evaluation for this family, keeping in mind that "[t]he [Fifth Amendment] privilege protects a defendant from being compelled to provide evidence of a 'testimonial or communicative nature.'" *J.R.U.-S.*, 126 Wn. App. at 793 (internal quotation marks omitted) (quoting *City of Seattle v. Stalsbroten*, 138 Wn.2d 227, 232, 978 P.2d 1059 (1999)). Generally, it "may be invoked whenever circumstances indicate that a real and substantial danger of incrimination exists." *J.R.U.-S.*, 126 Wn. App. at 793.

¶27 Here, although there are no criminal charges pending against KM, the State could bring charges based on any potential incriminating evidence obtained from the psychosexual examination. Thus, to protect KM's Fifth Amendment privilege, the juvenile court, if it orders a psychosexual evaluation based on findings that such an evaluation would assist with reunification, could exempt a parent from answering incriminating questions during the evaluation. *See United States v. Lee*, 315 F.3d 206, 212-13 (3d Cir. 2003) (polygraph condition did not violate defendant's Fifth Amendment right because it did not require him to answer incriminating questions).

¶28 Reversed and remanded for further proceedings.

ARMSTRONG, J., concurs.

¶29 WORSWICK, A.C.J. (dissenting) — I respectfully dissent from the majority's holding that the dependency court abused its discretion in ordering a psychosexual evaluation here. I would affirm.

### THE ROLE OF "UNFOUNDED" ALLEGATIONS

¶30 The majority contends that the trial court erred by allowing "unfounded" allegations to serve as a basis for the dependency court's order. Majority at 157. A determination

that allegations were unfounded or a decision by law enforcement not to seek criminal charges does not limit the dependency court's authority to order a psychosexual evaluation.

¶31 In the context of child abuse reports, Washington has a broad policy framework to protect children from abuse and to investigate allegations at the outset. RCW 26.44.010.[6] Once an allegation is made, the Department of Social and Health Services (DSHS) and law enforcement are directed to investigate any allegations, make a determination, and issue a report. RCW 26.44.050. DSHS defines "unfounded" as "the determination following an investigation . . . that based on available information it is more likely than not that child abuse or neglect did not occur or there is insufficient evidence for [DSHS] to determine whether the alleged child abuse did or did not occur." WAC 388-15-005. Despite DSHS's finding that the allegations were unfounded, there is no authority for the proposition that the dependency court is then precluded from ordering services as it sees fit under RCW 13.34.138 to fulfill its review and reunification obligations. In this case, KM stipulated to dependency and the dependency court relied on the evidence before it that some sort of inappropriate sexual conduct had occurred between KM and her children. The guardian ad litem (GAL) recommendation that a psychosexual evaluation be ordered, coupled with allegations

---

[6] RCW 26.44.010 provides:

The Washington state legislature finds and declares: The bond between a child and his or her parent, custodian, or guardian is of paramount importance, and any intervention into the life of a child is also an intervention into the life of the parent, custodian, or guardian; however, instances of nonaccidental injury, neglect, death, sexual abuse and cruelty to children by their parents, custodians or guardians have occurred, and in the instance where a child is deprived of his or her right to conditions of minimal nurture, health, and safety, the state is justified in emergency intervention based upon verified information; and therefore the Washington state legislature hereby provides for the reporting of such cases to the appropriate public authorities. It is the intent of the legislature that, as a result of such reports, protective services shall be made available in an effort to prevent further abuses, and to safeguard the general welfare of such children . . . .

from the children, was sufficient to support the dependency court's psychosexual evaluation order.

¶32 The "unfounded" versus "founded" distinction is a red herring. Whether or not sexual abuse allegations fall under one of these categories for purposes of potential criminal prosecution or to take a child into protective custody has no place in our analysis as to whether the dependency court should order a psychosexual evaluation when, as here, the parties involved stipulated to dependency. The standards in the dependency court context are entirely different, and so are the purposes. From the outset, KM's counsel has all but ignored this crucial distinction, seeking to blur the lines that separate these independent processes.

¶33 Seeking to discredit allegations because they were "unfounded" in the context of DSHS's and law enforcement's investigatory obligations is misguided in the dependency context. All allegations must stand on their own under the broader abuse of discretion standard when the dependency court seeks to order therapeutic services or in order to otherwise serve the policy goals of reunification.

### SUFFICIENT EVIDENCE

¶34 Lastly, I disagree with the majority's ultimate holding that sufficient evidence does not exist to support the dependency court's psychosexual evaluation order. I believe, as did the trial court, "that three children independently reporting sexual assaults by their parents is grounds for this court to order a psychosexual evaluation, regardless of who decided it was unfounded or who did or did not charge it criminally." Report of Proceedings (Dec. 15, 2009) at 65-66.

¶35 As the majority recognized, the standard of review by which we approach this is the abuse of discretion standard. Despite this, the majority appears to be conducting a de novo review of the dependency court's decision, weighing all of the facts, and substituting its own judgment. There

is enough evidence in the record to support the dependency court's order here, including (1) independently reported sexual abuse allegations by the children; (2) complaints of yeast infections, dysuria, and genital pain by the children; (3) inappropriate sexual behavior by one of the children; and (4) the recommendations of the GAL.

¶36 For the above-mentioned reasons, I dissent.