IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Dependency of W.W.S. and C.G.S. | No. 79763-8-I (consolidated with 79764-6-I) ORDER WITHDRAWING OPINION AND SUBSTITUTING OPINION |

On November 21, 2019, the appellant-mother filed a motion requesting that this court remove her name and her children's birthdates from the case caption and use her initials in the opinion. On March 30, 2020, we issued our opinion in this case and denied the mother's motion. The mother filed a motion for discretionary review in the Washington State Supreme Court, seeking review on the merits and citing confidentiality concerns regarding the denial of her motion.

On August 5, 2020, the Supreme Court granted the mother's motion for discretionary review as to the confidentiality issue only and entered an order remanding to this court to remove the name of the parent from the case caption to comply with RAP 3.4 and to remove the birthdates of the children from both the case caption and the opinion. The court denied petitioner's request to substitute initials for the mother's name in the body of the opinion. In view of the Supreme Court order, the opinion should be withdrawn and a substitute opinion be filed. Now, therefore, it is hereby

ORDERED that the opinion filed on March 30, 2020, is withdrawn and a substitute opinion be filed.

_____ J.

Andrus, A.C.J. _____   _____ Dwyer, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of W.W.S. and C.G.S., | ) ) ) ) ) ) ) | No. 79763-8-I (consolidated with 79764-6-I) DIVISION ONE PUBLISHED OPINION |

SMITH, J. — Melodee Starvish appeals the order adjudging two of her sons, W.W.S. and C.G.S., dependent. She contends that the juvenile court (1) violated her due process rights by basing certain findings on allegations regarding educational neglect and C.G.S.'s mental health of which she did not receive fair notice, (2) erred by ordering an out-of-home placement, (3) erred by ordering her to submit to urinalysis, and (4) erred by concluding that it lacked authority to direct the Department of Children, Youth, and Families (Department) to assign a new social worker to her case.

Because the record reflects that Starvish received ample notice that educational neglect and C.G.S.'s mental health would be at issue during the dependency hearing, we hold that Starvish was not deprived of due process. We further hold that the juvenile court did not err by ordering an out-of-home placement or concluding that it lacked authority to direct the Department to assign a new social worker. But because there was no reliable evidence in the record that Starvish had a substance abuse issue that required remedying as a

parental deficiency, the juvenile court abused its discretion by ordering Starvish to submit to urinalysis. Therefore, we reverse the juvenile court's imposition of the urinalysis requirement, remand to strike that requirement, and affirm in all other respects.

## FACTS

Starvish is the mother of two boys, W.W.S. and C.G.S. The boys' father is Brian Starvish (hereinafter, for clarity, Brian).

W.W.S. has been diagnosed with ADHD[1] and hospitalized several times to treat his mental health issues. He was the subject of an earlier dependency proceeding in 2017 (2017 Dependency), prior to which Child Protective Services (CPS) had been involved with the family five times. W.W.S. was adjudged dependent as to Brian in the 2017 Dependency. That dependency was later dismissed after Starvish completed services.

Brian was abusive and, following an incident at C.G.S.'s fifth birthday in 2017, Starvish left Brian. Starvish is in the process of divorcing Brian. At some point, Starvish moved with W.W.S. and C.G.S. into a confidential housing shelter.

On August 3, 2018, the State, through the Department, filed the dependency petition in this case.[2] It alleged that W.W.S. and C.G.S. were dependent as to both Brian and Starvish under RCW 13.34.030(6)(b) and (c). The former provides that a child is dependent if he "[i]s abused or neglected . . .

---

[1] Attention deficit hyperactivity disorder.
[2] The Department filed two petitions, one for W.W.S. and one for C.G.S. Because the allegations in the two petitions are the same, this memorandum refers to both petitions collectively as the "petition."

by a person legally responsible for [his] care," and the latter provides that a child is dependent if he "[h]as no parent, guardian, or custodian capable of adequately caring for [him], such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development" ("c" dependency). RCW 13.34.030(6)(b), (c).

The Department's petition alleged that on July 22, 2018, CPS received an intake alleging that W.W.S. had been left alone at the housing shelter for about five hours. According to the petition, the intake alleged that W.W.S. "was in emotional distress and wanted to call Ms. Starvish because they were supposed to meet at the complex to go to the beach together" and that W.W.S. "went into the housing complex office at 1:00 pm and reported that he believed Ms. Starvish had left without him." According to the petition, the intake also alleged that "this was not the first time this had occurred at the complex."

After describing CPS's multiple unsuccessful attempts to speak with Starvish after that intake, the Department's petition described another intake, on July 31, 2018, alleging that Starvish "had been seen regularly at a known drug house with [C.G.S.] and [W.W.S.]." According to the petition, the intake alleged that the two men in the house were Starvish's brother and another man. The petition alleged that in the days following the July 31 intake, the Department and CPS made additional, unsuccessful attempts to contact Starvish and meet with W.W.S.

The petition also described the family's prior involvement with CPS, alleged facts regarding the 2017 Dependency, and described three additional

CPS intakes involving Starvish that occurred after the 2017 Dependency was dismissed. According to the petition, all three of those intakes were closed as unfounded. One of the intakes, from April 2018, involved a report that W.W.S. had been falling asleep at school for long periods of time and missing up to seven days of school in a row.

After the Department filed its petition, the juvenile court held a shelter care hearing and, on August 9, 2018, entered an order placing W.W.S. in shelter care but releasing C.G.S. to Starvish.

On October 26, 2018, the Department filed an emergency motion to place C.G.S. into shelter care as well. The Department argued, relying on a social worker's declaration, that after shelter care was denied with respect to C.G.S. in August, "the mother ha[d] kept this child out of school for three weeks, alleging he [wa]s ill, but ha[d] not taken him to a doctor." The Department's motion also alleged that "[t]he mother appeared [at] the child's school this week causing a scene with school officials around contact with [W.W.S.]." The social worker's declaration also described a September 20 incident at school, where C.G.S. "was aggressive and said he was mad at his mother." According to the declaration, when Starvish came to the classroom to talk with the teacher, C.G.S. "started to get angry with his mother and did not want to go with her" and "started to flip her off repeatedly (about 6 times) before the teacher got him to stop." The social worker's declaration described a second incident a week later, where C.G.S. "dr[e]w overlapping circles over and over again in an angry manner." The declaration stated that when C.G.S. was asked about what he drew, he

4

responded that "it was 'the school getting sucked into a black hole' and he 'is in the school in the black hole' because he 'wants to be dead.'" Finally, the social worker's declaration described a third incident during which C.G.S.'s teacher saw him "trying to cut himself in the wrist with children['s] scissors." The juvenile court ordered that C.G.S. be taken into custody and, on November 2, 2018, after a review hearing, ordered that C.G.S. be placed into shelter care.

The juvenile court subsequently entered an order of default and an order of dependency as to Brian. The court held a two-day fact-finding hearing as to Starvish on February 27 and 28, 2019. The court heard testimony from Christina Cartwright, the vice principal of Beacon Hill International School, where W.W.S. was in fourth grade and where C.G.S. had attended kindergarten from September to approximately October 2018; Alexandria Pearman-Gillman, C.G.S.'s kindergarten teacher at Beacon Hill; Kirsten Bolduan, the Department's assigned social worker; Jennifer Moore, a visitation supervisor; Megan Notter, the guardian ad litem (GAL) for W.W.S. and C.G.S.; and Starvish. After the hearing, the court found by a preponderance of the evidence that a "c" dependency had been established as to both W.W.S. and C.G.S.

At a later disposition hearing, the court heard testimony from Bolduan and argument from Starvish, the Department, and the GAL. Starvish argued for an in-home dependency and asked the court to consider directing the Department to substitute Bolduan and assign a new social worker to her case. The GAL, too, asked the court "to encourage the Department to seriously consider reassignment to a different social worker" and stated her belief "that it's going to

5

be very difficult for both of them to work together." The GAL further requested that the court "either . . . order a chemical dependency evaluation or . . . something like 90 days twice a week random UAs [urinalyses], and if there is a missed . . . or positive that [Starvish] then be required to take chemical dependency evaluation." The GAL's request echoed earlier testimony from Bolduan, who also requested random urinalysis.

The juvenile court ultimately ordered an out-of-home placement and concluded that it did not have the authority to direct the Department to assign a new social worker to Starvish's case. Although the court did not order a chemical dependency evaluation,[3] it ordered Starvish to submit to random urinalysis once a week for 90 days and, additionally, up to 6 times per month upon the Department's suspicion of use. Starvish appeals.[4]

## DISCUSSION

### GAL's Brief

As an initial matter, after Starvish filed her appeal, the GAL moved for an

---

[3] At oral argument, the Department suggested that the juvenile court did order a chemical dependency evaluation. Although the record does contain an order that includes a drug/alcohol evaluation requirement, that order was entered on March 19, 2019, before the disposition hearing had concluded. Later, on March 27, 2019, the court stated at the disposition hearing that it was "not ordering a drug and alcohol evaluation," and on March 28, 2019, it entered a second order without that requirement.

[4] In her opening brief, Starvish assigned error to the juvenile court's finding that Brian agreed to an order of dependency. Because Starvish did not provide argument in support of that assignment of error, we do not consider it. RAP 10.3(a)(6); see also Escude v. King County Pub. Hosp. Dist. No. 2, 117 Wn. App. 183, 190 n.4, 69 P.3d 895 (2003) ("It is well settled that a party's failure to assign error to or provide argument and citation to authority in support of an assignment of error, as required under RAP 10.3, precludes appellate consideration of an alleged error.").

extension of time to file "the GAL's brief." A commissioner granted the GAL's request for an extension of time but expressly declined to address whether the GAL was entitled to file a brief at all. Starvish then filed a motion to preclude the GAL from filing a brief.[5] In her response to that motion, the GAL argued that she was a party to the case and, thus, entitled to file a brief.

We disagree. The authorities primarily relied on by the GAL (and by the Department in support of the GAL) establish, at most, that the GAL has *party-like* rights *below*, and that the GAL may seek review to enforce those rights.[6] Cf. In re Dependency of D.L.B., 186 Wn.2d 103, 106 n.1, 376 P.3d 1099 (2016) (observing, citing GALR 2(j) and GALR 4(h), that "guardian ad litem is treated as a party, but only for certain purposes *and only in superior court*" (emphasis added)). They do not support the proposition that the GAL is a party entitled to file a merits brief in response to a parent's appeal from a dependency order.

Furthermore, and although we have discretion to consider briefs from

---

[5] Because the GAL proceeded to file a brief, we denied Starvish's motion in a letter ruling. We hereby deny the GAL's motion for reconsideration of that ruling. See RAP 12.4(a) ("A party may file a motion for reconsideration only of a decision by the judges (1) terminating review, or (2) granting or denying a personal restraint petition on the merits."). We also deny Starvish's motion to strike (1) the GAL's motion for reconsideration and (2) the notice of appearance filed by attorney Jennie Cowan of the Dependency CASA Program.

[6] See In re Dependency of M.H.P., 184 Wn.2d 741, 749-50, 364 P.3d 94 (2015) (review of ex parte orders entered in a termination proceeding without notice to the court-appointed special advocate (CASA)); In re Dependency of P.P.T., 155 Wn. App. 257, 263-64, 229 P.3d 818 (2010) (appeal taken by State and CASA from order in which court dismissed petition and denied CASA's request to delay entry of written findings so that family could meet and discuss court's earlier oral ruling); In re Welfare of B.D.F., 126 Wn. App. 562, 569, 572, 109 P.3d 464 (2005) (discretionary review of GAL's appeal from trial court order that misinterpreted GAL's authority below).

nonparties under RAP 10.1(e) and (h), we do so on a case-by-case basis. To that end, although the GAL correctly points out that she "is charged with representing the best interest of" W.W.S. and C.G.S., the best-interests determination is an inherently factual one to be made by the juvenile court. See In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980) ("This court has repeatedly said that the goal of a dependency hearing is to determine the welfare of the child and his best interests. While the criteria for establishing the best interests of the child are not capable of specification, *each case being largely dependent upon its own facts and circumstances*, the proof necessary in order to deprive a person of his or her parental rights must be clear, cogent and convincing." (emphasis added) (citations omitted)). By contrast, whether Starvish is entitled to relief *on appeal* is based not on the best interests of her children but on whether the juvenile court committed legal error. Thus, the GAL's input would not facilitate a decision on the merits in this appeal. We accordingly decline, as an exercise of our discretion, to consider the GAL's brief.

Due Process

Starvish asserts that reversal is required because a number of the juvenile court's findings (findings of fact 11-20 and 24) were based on allegations regarding educational neglect and C.G.S.'s mental health of which she did not receive fair notice. Specifically, in finding of fact 24, the juvenile court cited to "the evidence of the number of days missed from school, the lack of attention to the children's mental health, [W.W.S.]'s serious mental health needs, [and C.G.S.]'s expression of self-harm." And, based on testimony from Cartwright,

8

Pearman-Gillman, and the GAL, the juvenile court made findings of fact 11-20 regarding the children's educational deficiencies, C.G.S.'s lengthy absence from school in fall 2018, both children's recent progress, and specific incidents that had occurred at Beacon Hill.  These incidents included (1) a September 2018 incident when Starvish showed up on the Beacon Hill campus asking for her children and, when she crossed paths with W.W.S., told him that he should not take his ADHD medication and did not need it, (2) a December 2018 incident where Starvish telephoned into an IEP[7] meeting regarding W.W.S., became belligerent, and after she was disconnected, showed up on the Beacon Hill campus and became aggressive with school staff, and (3) the three incidents involving C.G.S. that were the basis of the Department's earlier motion to place C.G.S. in shelter care.  As further discussed below, we conclude that the juvenile court did not deprive Starvish of due process in entering these findings.

As an initial matter, the Department argues that we should decline to consider Starvish's due process argument because it was raised for the first time on appeal.  Meanwhile, Starvish argues that her due process argument is reviewable under RAP 2.5(a)(3) as an issue of constitutional magnitude.  We agree with Starvish and reach the merits of her argument.  Cf. In re Dependency of A.M.M., 182 Wn. App. 776, 790 & n.8, 332 P.3d 500 (2014) (reviewing, as issue of constitutional magnitude, parent's contention that her due process rights were violated when the trial court terminated her parental rights based on a parental deficiency of which she was not notified).

---

[7] Individualized education program.

"The due process clause of the Fourteenth Amendment protects a parent's right to the custody, care, and companionship of her children." In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992). "That right cannot be abridged without due process of law." Key, 119 Wn.2d at 609. We review de novo an alleged deprivation of due process. In re Welfare of A.G., 160 Wn. App. 841, 844, 248 P.3d 611 (2011). "In the context of a dependency proceeding, due process requires that parents have notice, an opportunity to be heard and defend, and the right to assistance of counsel." In re Dependency of H.W., 70 Wn. App. 552, 555-56, 854 P.2d 1100 (1993).

We conclude that Starvish received adequate notice that educational neglect and C.G.S.'s mental health issues would be at issue at the fact-finding hearing. Specifically, with regard to educational neglect, the petition itself referred to an April 2018 intake alleging that W.W.S. "had been falling asleep at school for long periods of time and missing up to 7 days of school in a row" and that he "was exhibiting symptoms of mental health issues that weren't being addressed and Ms. Starvish was not engaging with the school on these concerns." It also alleged that W.W.S. had exceptional needs and acted violently toward others when not medicated but that Starvish nonetheless allowed him to go without mental health treatment or medication in early 2017.

Later in the dependency proceeding but still more than four months before the court's fact-finding hearing, the Department moved for an order authorizing W.W.S. to take ADHD medication as prescribed by his treating physician. The Department alleged that it had approached Starvish to ask for her consent, and

10

she did not consent. In support of its motion, the Department submitted letters from Cartwright and two teachers at Beacon Hill who described the noticeable improvement in W.W.S.'s behavior and ability to attend and participate in school after starting ADHD medication. After the juvenile court entered a temporary order authorizing medication, the GAL filed a declaration in support of a final order. In her declaration, the GAL stated that W.W.S. was held back a year in school and although he was then in the fourth grade, he was reading at a second-grade level. The GAL attributed W.W.S.'s struggles in school to his untreated ADHD. In short, the record reflects that Starvish received ample notice that W.W.S.'s performance in school would be at issue during the fact-finding hearing.

As for C.G.S., Starvish does correctly point out that the Department's petition did not make specific allegations as to C.G.S.'s performance in school or C.G.S.'s mental health. Nonetheless, Starvish received ample notice of these allegations as well. Specifically, and as discussed, allegations regarding C.G.S.'s absence from school and incidents that raised concerns regarding his mental health, including self-harm ideations, were the subjects of the Department's October 2018 emergency motion to place him into shelter care. Because Starvish received notice of these allegations in connection with the shelter care motion and well before the fact-finding hearing, she had ample notice that C.G.S.'s educational neglect and his mental health would be at issue during the fact-finding hearing. Cf. In re Parental Rights to F.M.O., 194 Wn. App. 226, 231, 374 P.3d 273 (2016) (looking, in termination context, to entire case

record to determine whether parent received adequate notice of an alleged deficiency).

In sum, Starvish received fair notice of the Department's allegations of educational neglect with regard to both W.W.S. and C.G.S., and of the Department's allegations regarding C.G.S.'s mental health. Thus, the juvenile court did not deprive her of due process by entering findings of fact 11-20 and 24 based on testimony regarding these allegations.

Starvish disagrees and points out that the Department's petition contained only allegations regarding events that occurred *before* it was filed. She then relies on In re Dependency of A.J., 189 Wn. App. 381, 357 P.3d 68 (2015), for the proposition that the fact-finding hearing is held "on the petition" and contends that she was deprived of due process because the Department never amended its petition to incorporate new allegations that arose later. But Starvish's reliance on A.J. is misplaced. There, the Department's petition alleged only a "c" dependency, and the court held a fact-finding hearing on that allegation alone. A.J., 189 Wn. App. at 403. More than six months later, the Department filed a "Motion to Establish Dependency" in which it for the first time alleged dependency under RCW 13.34.030(6)(a), i.e., for abandonment. A.J., 189 Wn. App. at 403. Without holding another fact-finding hearing, the trial court determined A.J. to be dependent under both prongs. A.J., 189 Wn. App. at 403.

In concluding that the trial court denied the parent due process, we observed that abandonment was never even pleaded in the dependency petition and that the parent "had *no* notice of the abandonment allegation at the fact-

12

finding stage." A.J., 189 Wn. App. at 403 (emphasis added). Here, by contrast, the statutory basis for the Department's dependency allegations *was* pleaded in the petition, and as discussed, Starvish *did* have notice at the fact-finding stage of the allegations on which the court's challenged findings are based. Thus, A.J. is not persuasive.[8]

Starvish also relies on our decision in A.M.M. to support her contention that she was deprived of due process. But A.M.M. is unpersuasive for two reasons. First, "[d]ue process is a flexible concept that may vary with the interests that are at stake." F.M.O., 194 Wn. App. at 230. To that end, A.M.M. involved a termination proceeding, which can result in a permanent deprivation of a parent's rights. By contrast, a dependency proceeding is "'a preliminary, remedial, nonadversary proceeding'" and "does not inevitably lead to a termination of parental rights." H.W., 70 Wn. App. at 556 (quoting Key, 119 Wn.2d at 609). Second, in A.M.M., there was "no evidence in the record" that the mother could lose her parental rights based on the parental deficiency at issue in that case. A.M.M., 182 Wn. App. at 792. But here, as discussed, the record reflects that Starvish received ample notice of the allegations on which the juvenile court's challenged findings were based. Accordingly, and even assuming that the same process is due in a dependency proceeding as in a termination proceeding, Starvish was not—like the mother in A.M.M.—rendered

---

[8] Although we conclude that Starvish was not deprived of due process, we note that the best practice would have been for the Department to amend its petition. See JuCR 3.5 (providing that a dependency petition "may be amended at any time" and "[t]he court shall grant additional time if necessary to insure a full and fair hearing on any new allegations in an amended petition").

surprised, helpless, or disadvantaged when those allegations were tested at the hearing. See A.M.M., 182 Wn. App. at 791 (purpose of notice is "'to prevent surprise, helplessness and disadvantage.'" (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970))). A.M.M. does not require reversal.

Out-of-Home Placement

Starvish argues that the juvenile court erred by ordering an out-of-home placement. Specifically, Starvish contends that the juvenile court erred by finding that she was not "available" to care for W.W.S. and C.G.S. under former RCW 13.34.130(5)(a) (2018) (recodified as RCW 13.34.130(6)(a)). She contends, in the alternative, that remand is required because the juvenile court failed to make requisite findings. We reject both contentions.

*"Available"*

A juvenile court may order out-of-home placement only upon making certain findings:

> An order for out-of-home placement may be made only if the court finds that reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home, specifying the services . . . that have been provided . . . , and that preventive services have been offered or provided and have failed to prevent the need for out-of-home placement, unless the health, safety, and welfare of the child cannot be protected adequately in the home, and that:
>     *(a) There is no parent or guardian available to care for such child;*
>     (b) The parent, guardian, or legal custodian is not willing to take custody of the child; or
>     (c) The court finds, by clear, cogent, and convincing evidence, a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home and an order under RCW 26.44.063 would not protect the child from danger.

14

Former RCW 13.34.130(5) (emphasis added). Here, the juvenile court found, in accordance with this statute, that (1) the Department "made reasonable efforts to prevent or eliminate the need for removal of the children," (2) "[t]he health, safety, and welfare of the children cannot be adequately protected in the home," and (3) "*there is no parent or guardian available to care for the children.*" (Emphasis added.) Starvish challenges this final finding. She contends that a parent is "available" under former RCW 13.34.130(5)(a) so long as she is physically available and because she was physically available, Starvish was available to care for W.W.S. and C.G.S. We disagree.

Starvish's argument raises a question of statutory interpretation, which we review de novo. Leishman v. Ogden Murphy Wallace PLLC, 10 Wn. App. 2d 826, 831, 451 P.3d 1101 (2019), review granted, 194 Wn.2d 1023 (2020). Our "fundamental objective in determining what a statute means is to ascertain and carry out the legislature's intent." Durant v. State Farm Mut. Auto. Ins. Co., 191 Wn.2d 1, 8, 419 P.3d 400 (2018). "If the statute's meaning is plain on its face, then courts must give effect to its plain meaning as an expression of what the legislature intended." Durant, 191 Wn.2d at 8. To discern a statute's plain meaning, we consider the text of the provision in question, taking into account the statutory scheme as a whole. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). "We may use a dictionary to discern the plain meaning of an undefined statutory term." Nissen v. Pierce County, 183 Wn.2d 863, 881, 357 P.3d 45 (2015). If, after conducting this inquiry, the statute is "susceptible to more than one reasonable meaning, the statute is ambiguous

and it is appropriate to resort to aids to construction." Campbell & Gwinn, 146 Wn.2d at 12.

Former RCW 13.34.130(5)(a) does not define "available." The dictionary, however, defines "available" as "capable of use for the accomplishment of a purpose," "immediately utilizable," "that is accessible or may be obtained," and "at disposal." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 150 (2002). In other words, the dictionary does not inform the plain meaning of "available" because, under the dictionary definitions, "available" may refer to a parent who is capable of taking on the responsibility of parenting, or one who is merely physically available.

That said, "[p]lain language interpretation of a statute looks not only to the provision in question, but to other related provisions that illuminate legislative intent." Columbia Riverkeeper v. Port of Vancouver USA, 188 Wn.2d 421, 438, 395 P.3d 1031 (2017). To this end, the dependency statutes contain, at RCW 13.34.020, an express declaration of that intent. Specifically, the legislature declared "that the family unit should remain intact *unless a child's right to conditions of basic nurture, health, or safety is jeopardized*." RCW 13.34.020 (emphasis added). Additionally, "[w]hen the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, *the rights and safety of the child should prevail*." RCW 13.34.020 (emphasis added). In other words, the best interests of the child are the juvenile court's paramount concern in making placement decisions. In re Dependency of Ca.R., 191 Wn. App. 601, 610, 365 P.3d 186 (2015).

16

In light of this clear declaration of legislative intent, "available" must refer to something more than physical availability. Otherwise, and contrary to the legislature's declared intent, a child could be placed with a parent even though that placement would jeopardize the child's right to basic nurture, health, or safety. Cf. Columbia Riverkeeper, 188 Wn.2d at 439 (conducting plain language analysis and rejecting interpretation of statute that would have frustrated express declaration of legislative intent). For these reasons, we conclude that under the plain language of former RCW 13.34.130(5)(a), a parent is not "available" if she has deficiencies that jeopardize the child's rights of basic nurture, physical and mental health, and safety.[9] Indeed, this interpretation is supported by the text of that statute, which requires not just a finding that no parent is "available," but that no parent is "available *to care for such child*." Former RCW 13.34.130(5)(a) (emphasis added).

Starvish contends that reading "available" to mean more than physical availability would "render[ ] meaningless [former RCW 13.34.130(5)(c)], which considers whether clear and convincing evidence shows a manifest danger of abuse or neglect in placing the child with the parent." But there may be circumstances where a parent is "available" in that she has the ability to provide for a child's basic nurture, physical and mental health, and safety, but where an in-home placement would nonetheless pose a manifest danger to the child for

---

[9] In In re Dependency of A.Z.B., No. 49737-9-II, slip op. at 17-21 (Wash. Ct. App. Oct. 24, 2017) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2049737-9-II%20Unpublished%20Opinion.pdf, Division Two reached the same conclusion after determining that the term "available" was ambiguous.

other reasons, such as the presence of an abuser or environmental dangers in or around the parent's home. Therefore, Starvish's contention fails.

Starvish next argues that a broader reading of "available" violates the presumption that the legislature intends different meanings when it uses different terms in the same statutory scheme. She points out that the legislature could have chosen to adopt the "no capable parent" standard for determining a "c" dependency as the standard for determining whether a parent is "available," but it did not. Thus, she argues, "[r]eading the 'no available' parent standard to mean the same thing as the no capable parent standard would add words to the statute that are not there" and render the availability inquiry superfluous. But the canon of construction on which Starvish relies cannot trump the statute's plain meaning, as informed by the legislature's declared intent that the child's best interests are of paramount importance. Cf. Heritage Grove v. Dep't of Health, 11 Wn. App. 2d 406, 411, 453 P.3d 1022 (2019) (court considers canons of construction only if ambiguity exists). And as discussed, accepting Starvish's interpretation of "available" would allow in-home placement even when a child's physical and mental health and safety are in jeopardy, contrary to the legislature's declared intent. Therefore, Starvish's argument fails.

Starvish next contends that a broader reading of "available" would "turn the preference for in-home dependencies on its head." But the inquiry required under former RCW 13.34.130(5) already recognizes this preference by authorizing out-of-home placement only when reasonable efforts have been made to prevent removal. Once that threshold has been met, placement

18

decisions are based on the child's best interests.  See In re Dependency of A.C., 74 Wn. App. 271, 279, 873 P.2d 535 (1994) (holding that trial court erred by failing to give paramount consideration to child's best interests in making placement decision).  Indeed, and as discussed, the legislature expressly declared that "the family unit should remain intact *unless a child's right to conditions of basic nurture, health, or safety is jeopardized*."  RCW 13.34.020.  Therefore, Starvish's contention fails.

*Findings*

Starvish contends, in the alternative, that remand is required because the juvenile court did not make sufficient findings to support its conclusion that out-of-home placement was warranted.  Specifically, Starvish asserts that the court's determinations that (1) the Department "made reasonable efforts to prevent or eliminate the need for removal of the children," (2) "[t]he health, safety, and welfare of the children cannot be adequately protected in the home," and (3) "there is no parent or guardian available to care for the children" were conclusions of law for which more detailed findings were required.  We disagree.

"'If a determination concerns whether evidence shows that something occurred or existed, it is properly labeled a finding of fact.'"  Inland Foundry Co. v. Dep't of Labor & Indus., 106 Wn. App. 333, 340, 24 P.3d 424 (2001) (quoting State v. Niedergang, 43 Wn. App. 656, 658, 719 P.2d 576 (1986)).  "However, 'if the determination is made by a process of legal reasoning from facts in evidence, it is a conclusion of law.'"  Inland Foundry, 106 Wn. App. at 340 (quoting Niedergang, 43 Wn. App. at 658-59).

19

Here, the juvenile court's determinations are plainly findings of fact and not conclusions of law. Indeed, the governing statute, former RCW 13.34.130(5), expressly characterizes these determinations as findings:

> An order for out-of-home placement may be made only if the court *finds that* reasonable efforts have been made . . . *and that* preventive services have been offered or provided . . . *and that*[ ]
> . . . [t]here is no parent or guardian available to care for such child.

Former RCW 13.34.130(5)(a) (emphasis added). Furthermore, whether the Department has made reasonable efforts, whether services have been offered, and whether a parent is available involve determinations of whether something occurred or existed. Therefore, contrary to Starvish's contentions, these determinations are findings of fact. And because Starvish does not argue that the evidence was insufficient to support these findings, neither remand nor reversal is required. See Perry v. Costco Wholesale, Inc., 123 Wn. App. 783, 792, 98 P.3d 1264 (2004) ("Where the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law.").

Starvish contends that the juvenile court's determinations are insufficient because they parrot the statutory language. But findings of fact that parrot statutory requirements are not invalid if they are specific enough to permit meaningful appellate review. See In re Dependency of K.R., 128 Wn.2d 129, 143, 904 P.2d 1132 (1995) ("Findings of fact which closely follow and which may to a certain extent parrot [statutory] requirements . . . are not rendered invalid if

20

they are sufficiently specific to permit meaningful review."). Here, the juvenile court's findings are specific enough to permit meaningful review even though they closely track the statutory language. Specifically, had Starvish challenged the court's findings—which she did not—we could readily determine, with reference to the record, whether the findings were supported by substantial evidence. Therefore, Starvish's contention fails.

Urinalysis Requirement

Starvish argues that the juvenile court erred by directing her to submit to random urinalysis for 90 days and additional urinalysis upon the Department's suspicion of use. We agree.

"The dependency statutes provide a broad framework from which the juvenile court may order services to facilitate parent-child reunification." In re Dependency of D.C.-M., 162 Wn. App. 149, 158, 253 P.3d 112 (2011). But as the Department itself acknowledges, "[o]nce intervention into the family's life is authorized by the establishment of dependency, the court can require a parent to participate in a service *when the circumstances in the record support the particular service*." (Emphasis added.) To that end, RCW 13.34.025, regarding coordination of services, expressly provides that "[t]his section . . . does not create judicial authority to order the provision of services *except for the specific purpose of making reasonable efforts to remedy parental deficiencies identified in a dependency proceeding under this chapter*." RCW 13.34.025(2)(d) (emphasis added). That statute also mandates that the number of contacts a parent is required to make should be minimized to the extent possible.

21

RCW 13.34.025(1)(b).

We review the juvenile court's decision to order a particular service for abuse of discretion. D.C.-M., 162 Wn. App. at 158. "The juvenile court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons." In re Dependency of B.F., 197 Wn. App. 579, 586, 389 P.3d 748 (2017). Here, there was no reliable evidence in the record establishing that Starvish had a substance abuse issue that required remedying as a parental deficiency. Therefore, we conclude that the juvenile court abused its discretion by ordering urinalysis.

D.C.-M. is instructive. There, Division Two considered whether the juvenile court erred by ordering the mother, K.M., to undergo a psychosexual evaluation. D.C.-M., 162 Wn. App. at 157-58. The court concluded that the juvenile court did err. D.C.-M., 162 Wn. App. at 162. Specifically, the court acknowledged that the juvenile court had broad discretion to order services aimed at reunification. D.C.-M., 162 Wn. App. at 158. It nevertheless concluded that the juvenile court abused that discretion by ordering a psychosexual evaluation "because (1) the order relies solely on the children's allegations, which [the Department] ruled were unfounded, and (2) there was no evidence before the court sufficient to show its usefulness as a service to reunify this family." D.C.-M., 162 Wn. App. at 157. The court also observed that the juvenile court failed to consider an alternative approach recommended by the children's therapist, i.e., "consult[ation with] a sexual therapist who, after engaging with KM and DC-M for treatment, could then make recommendations about what testing, if any, would assist the

identification of particular services aimed at reunification." D.C.-M., 162 Wn. App. at 162.

Here, as in D.C.-M., the evidence in the record is insufficient to support the urinalysis requirement imposed on Starvish. Specifically, the urinalysis requirement was based primarily on Bolduan's testimony. But when asked at the fact-finding hearing why she suspected drug use, the only sign Bolduan mentioned was that she had observed pockmarks on Starvish on several occasions. Later, at the disposition hearing, Bolduan also referred to Starvish's "unpredictable behavior, her outbursts, . . . [and] how she interacts with people, you know it's very hostile, very demanding." At no point, however, did Bolduan explain why she believed this behavior indicated that Starvish was using drugs. Indeed, in her earlier testimony, Bolduan twice attributed the same behavior to Starvish's mental health issues, not to suspected drug use. Moreover, when asked at the disposition hearing why she was requesting urinalysis, Bolduan responded only that "the Department would hope that random UAs would motivate Ms. Starvish to lead a clean and sober life" and "[m]aybe to rule out drug use." But this reasoning would justify subjecting *any* parent to urinalysis regardless whether there was evidence of drug use, and Bolduan provided no further testimony explaining how urinalysis would promote reunification for *this* family.

In short, the evidence was not sufficient to show that Starvish had a substance abuse issue that required remedying as a parental deficiency. Indeed, the juvenile court itself acknowledged that the evidence was not sufficient even to

23

support a drug and alcohol evaluation to determine, as an initial step, whether there was a chemical dependency issue at all and to identify services aimed at reunification. By nonetheless ordering urinalysis under these circumstances, the juvenile court increased the number of contacts Starvish would need to make for a service whose usefulness to reunify the family was not supported by the record. This was an abuse of discretion.

The Department disagrees and argues that the juvenile court "had a tenable basis for ordering random urinalysis testing." The Department points out that Bolduan testified that C.G.S.'s caregivers had told her that their daughter and Starvish "used to do drugs together." The Department also points out that there was a CPS intake alleging that Starvish had been seen regularly at a known drug house with W.W.S. and C.G.S. But not only is the caregivers' statement hearsay, it is unreliable given that there is no additional testimony about how long ago the alleged use occurred or how it is relevant to Starvish's current ability to parent. And although under ER 1101(c)(3) the rules of evidence do not apply at a disposition hearing in juvenile court, due process nonetheless requires that the disposition be based on reliable evidence. See State v. Strauss, 119 Wn.2d 401, 419, 832 P.2d 78 (1992) (sentence must be based on reliable evidence); State v. Kisor, 68 Wn. App. 610, 620, 844 P.2d 1038 (1993) (restitution must be based on reliable evidence).

To this end, the "known drug house" evidence also is unreliable. Although the Department's witness list included a fact witness who would have testified as to his observations and interactions that led to the "known drug house" intake,

24

the Department did not call that witness. And the Department points to no other testimony that substantiated that intake, much less how it was "known" that the house in question was a "drug house." Moreover, the intake also alleged that Starvish's brother was in the house, and the Department points to no evidence in the record that Starvish was not allowed to be there or to see her brother. In short, the additional evidence cited by the Department is not sufficient to justify urinalysis.[10]

Request To Replace Social Worker

Starvish contends that the juvenile court erred by concluding that it lacked authority to direct the Department to assign a new social worker to Starvish's case. We disagree.

The issue of a trial court's legal authority is a question of law reviewed de novo. O'Neill v. City of Shoreline, 183 Wn. App. 15, 21, 332 P.3d 1099 (2014). Here, Starvish argues that the juvenile court had authority to direct the Department to assign a new social worker because of the communication breakdown between Starvish and Bolduan. Meanwhile, the Department argues that the juvenile court did not have that authority because granting the relief requested by Starvish would have violated separation of powers. We agree with the Department.

---

[10] Because we conclude that the juvenile court abused its discretion in directing Starvish to submit to urinalysis, we do not address Starvish's argument that the urinalysis requirement violated her rights under article I, section 7 of the Washington Constitution. See State v. McEnroe, 179 Wn.2d 32, 35, 309 P.3d 428 (2013) (appellate court will avoid deciding constitutional questions where case may be fairly resolved on other grounds).

"Under the separation of powers doctrine, the fundamental function of each branch of government must remain inviolate, and one branch may not threaten the independence or integrity of another." Afoa v. Dep't of Labor & Indus., 3 Wn. App. 2d 794, 810, 418 P.3d 190 (2018). To this end, "[c]ourts will not interfere with the work and decisions of an agency of the state, so long as questions of law are not involved, and so long as the agency acts within the terms of the duties delegated to it by statute." Wash. State Coal. for Homeless v. Dep't of Soc. & Health Servs., 133 Wn.2d 894, 913, 949 P.2d 1291 (1997).

Here, the Department's decisions about how to manage internal resources, including decisions about what staff is to be assigned to what cases, fall squarely within the purview of the executive branch. See RCW 43.216.025(3) ("The internal affairs of the [D]epartment are under the control of the secretary in order that the secretary may manage the department in a flexible and intelligent manner as dictated by changing contemporary circumstances. Unless specifically limited by law, the secretary has the complete charge and supervisory powers over the [D]epartment."). And Starvish does not explain how maintaining Bolduan as the social worker in her case would be contrary to law or constitute agency action that falls outside the terms of the duties delegated to it by statute. Nor does she contend that interference is authorized because the Department's decision to assign Bolduan is arbitrary, tyrannical, or predicated on a fundamentally wrong basis. See Wash. State Coal. for Homeless, 133 Wn.2d at 914 ("[W]here the acts of public officers are arbitrary, tyrannical, or predicated upon a fundamentally wrong basis, then the courts may interfere to protect the

26

rights of individuals."). Therefore, the juvenile court did not err in concluding that it was without authority to direct the Department to assign a new social worker.

Starvish contends that "[t]he court may order the Department to take action consistent with chapter 13.34 RCW." She cites, as an example, RCW 13.34.136(3), which expressly directs the court to require the Department to file a termination petition under certain circumstances. She then asserts that it follows that "when it is in furtherance of reunification or the best interests of the child, the court may order a new social worker substitute[d] in." But the fact that the court is authorized *by statute* to direct the Department to act in certain circumstances does not mean that the court otherwise has the authority to interfere with the Department's personnel assignments based on the goal of reunification or the child's best interests.

Starvish also points out that "if a social worker disregards a court order, the court has authority [to] take action through sanctions or other measures." But as discussed, the court may of course interfere if the Department acts contrary to law. Starvish does not explain, however, how Bolduan's continued assignment as the social worker on Starvish's case would be contrary to law.

Finally, Starvish points to In re Dependency of T.L.G., where we reversed a termination order in part because the Department failed to demonstrate that it had offered the parents all services necessary to correct parental deficiencies. 126 Wn. App. 181, 206, 108 P.3d 156 (2005). But the fact that the Department has a duty to offer a parent necessary services does not mean that the court may interfere with the Department's internal personnel decisions made in the course

27

of carrying out that duty.  Therefore, T.L.G. is not persuasive here.

We reverse the juvenile court's imposition of the urinalysis requirement, remand to strike that requirement, and affirm in all other respects.

WE CONCUR:

Andrus, A.C.J.

28