IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>S.I.L.,<br><br>A Minor Child. | No. 83171-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

ANDRUS, C.J. — K.P., the father of 14-year-old S.I.L., appeals the trial court's finding that S.I.L. is dependent under RCW 13.34.030(6)(c). He contends insufficient evidence supports the trial court's factual findings. The father also argues the trial court abused its discretion by ordering him to submit to a psychosexual evaluation without expressly excluding polygraph and penile plethysmograph (PPG) tests, and that ordering such tests violates his substantive due process rights.

We conclude there is sufficient evidence to support the challenged findings, and those findings support the conclusion that S.I.L. is dependent under RCW 13.34.030(6)(c). We decline to reach the issue of whether the trial court abused its discretion in ordering K.P. to undergo a polygraph or PPG test or violated K.P.'s due process rights in ordering him to do so because the trial court did not actually order K.P. to undergo either test. We affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

## FACTS

In January 2021, the Department of Children, Youth and Families (the Department) received three separate intake reports regarding then 13-year-old S.I.L., who resided with her mother, A.L. Leanne King, the Child Protective Services (CPS) social worker who investigated the reports, discovered that A.L. was experiencing a serious mental health episode involving delusional thoughts and hallucinations. A.L. believed someone was after her and had gotten inside her mattress; A.L. began to beat and slash the mattress to find the person hiding inside and asked S.I.L. to help her. A.L. fled the house with SIL, and, while driving away, A.L. began driving erratically because she believed that the intruder was now on top of the car's roof and she needed to knock the person off. Eventually, A.L. drove herself and her daughter to the home of A.L.'s father. A.L. was transported to St. Joseph Hospital for treatment and involuntarily detained for 120 hours.

When King learned of A.L.'s 2021 mental health detention, she contacted the grandfather and learned S.I.L. was at his home, where S.I.L. remained while CPS attempted to engage A.L. in services. A.L. continued to exhibit delusional thoughts after being discharged from the hospital and, after the effort to engage A.L. in services proved unsuccessful, King determined she needed to remove S.I.L. from A.L.'s care. When King contacted S.I.L.'s father, K.P., he informed King that he was not in a position to parent S.I.L., that he had lost his job and was looking for employment, and that he believed S.I.L. was safe in the care of her maternal grandfather. K.P. told King that he had not seen S.I.L. in years and had stopped trying to see her because he did not want to deal with A.L. Because the

father did not want to parent S.I.L., CPS began to prepare the paperwork to file a dependency petition and to obtain court approval for placement with her grandfather.

The Department filed the dependency petition on February 11, 2021. It obtained an order authorizing the Department to take S.I.L. into its custody that same day. The parents did not contest shelter care and agreed that, at that point, S.I.L. had no parent available to provide supervision and care for the child. They also stipulated to placement with the maternal grandfather. The court authorized the parents to have a minimum of two hours of supervised visitation with S.I.L., two times each week and also approved "liberal phone visits between mother/father and child" subject to the "child's willingness to participate." The court appointed a guardian ad litem (GAL) for S.I.L., and, at the teen's request, also appointed counsel to represent her.

On March 30, 2021, the father answered the petition, asserting he was capable of adequately caring for S.I.L. The trial court scheduled a fact-finding hearing on the issue of dependency as to the father, which it conducted on July 27, 28, 29, and August 3, 2021. The mother did not participate in this hearing, although her attorney appeared via Zoom.

At this hearing, the trial court heard testimony that the mother had a long history of mental illness. In 2012, A.L. had reported, without evidence, that her and K.P.'s son, then in his early teens, had raped S.I.L. A.L. began verbally abusing the boy. This incident led the Department to remove him from A.L.'s care and to initiate a dependency petition for the protection of A.L.'s son, who was

suicidal as a result of his mother's belief that he had raped his younger sister and his mother's refusal to allow him to remain in her home.

At that point, CPS contacted K.P. to tell him that the Department had removed the son from A.L.'s custody due to A.L.'s mental state. The Department supported K.P. in filing a parenting plan for the son. The son lived with K.P. for a few months and then went to live with his maternal grandfather, with K.P.'s consent. He remained in his grandfather's care until he reached the age of 18. When the son went to live with his grandfather, the Department dismissed its dependency petition.

K.P. has had an ongoing awareness of A.L.'s mental health issues, both because of the Department advising him of her condition and his involvement in their fifteen-year, on-again-off-again relationship. He reported that while they never married or lived together, up until 2010, he was often at her home after work to help her with the two children. For the first three years of S.I.L.'s life, K.P. testified that he took an active role in helping to raise his daughter. He stopped interacting with A.L., however, because she became violent with him, threw things at him, and began to demand that he pay money to see his children. When he refused, K.P. testified that A.L. took S.I.L. and his son to live in a different county. For approximately a decade, K.P. had no contact with S.I.L., with the exception of a single visit when she was ten years old. S.I.L. told King that she would not recognize her father if she passed him on the street.

The Department also learned that K.P. had a fairly extensive criminal history. In 1995, he was convicted of negligent driving. In 1998, he was convicted of fourth degree assault and first degree negligent driving. In 2001, he pleaded

- 4 -

guilty to indecent exposure and residential burglary. K.P. testified that the 2001 convictions arose out of an incident involving A.L. when he entered A.L.'s apartment without her knowledge in an attempt to have sexual relations with her. The court, as a part of this conviction, entered a domestic violence protection order for the protection of A.L. K.P. was sentenced to nine months in jail for indecent exposure and 75 days in jail for the burglary conviction.

In 2008, K.P. was convicted of criminal trespass, and in 2010 he was convicted again of fourth degree assault and second degree unlawful possession of a firearm.

In 2014, K.P., who was then married, was convicted of domestic violence voyeurism for taking a naked photo of his 18-year-old stepdaughter while she slept, a photograph which was backed up on Google. K.P. claimed at the dependency hearing that the purpose of the photo was not for sexual reasons, but rather to blackmail his stepdaughter into getting a job and to teach her a lesson. He was sentenced to 5 months in jail and 12 months of community custody. While in community custody, he was ordered not to consume any alcohol. The court entered a sexual assault protection order for the benefit of his victim, prohibiting him from having any contact with her until January 2018.

As part of the 2014 conviction, K.P. was also ordered to register as a sex offender, to submit to a sexual deviancy evaluation and comply with any treatment recommendations, and to submit to a sexual history and "periodic polygraphs and/or plethysmograph assessments" as directed by the Department of Corrections. The 2014 judgment and sentence also required K.P. to obtain a mental health and a chemical dependency evaluation. K.P. had no recollection of

ever undergoing a mental health evaluation and was not sure he was required to complete a chemical dependency evaluation. K.P. testified that he completed a "sexual evaluation," that it took about two hours, and that at the end, the evaluator told him "I passed and I don't need any more counseling for that." It was unclear if this evaluation was actually a sexual deviancy, mental health, or substance abuse evaluation. Neither the Department nor K.P.'s attorney was able to verify what evaluations K.P. underwent before the contested dependency hearing.

In 2016, K.P. was convicted for driving under the influence. He was placed on five years of probation.

In 2021, at the dependency hearing for S.I.L., Department social worker Joshua Sharon testified that before S.I.L. went to live with her grandfather, she had experienced suicidal ideation and depression and had begun experimenting with vaping, alcohol, and cannabis. S.I.L. was reserved, closed off, not doing well in school, and not engaged in extracurricular activities. Sharon attributed her mental health and academic difficulties in part to her feeling unsafe living with a mother experiencing hallucinations. With the stability and predictability S.I.L. gained with her grandfather, however, she became more conversant, got involved in volleyball at school, began to improve academically, and began to engage with a math tutor set up by her grandfather. She is no longer verbalizing suicidality and has not experimented with substances since entering her grandfather's care. Sharon expressed concerns that moving S.I.L. into her father's care would jeopardize S.I.L.'s progress because she had no bond with K.P. and had expressed reluctance in developing a relationship with her father.

S.I.L.'s court-appointed GAL, Kathy Hilmoe, testified that she has serious concerns about K.P.'s capability to meet S.I.L.'s special mental health and academic needs given the lack of a bond between father and daughter. K.P. told Hilmoe he was not interested in parenting classes (possibly because he mistakenly believed he would have to pay for them). Hilmoe found most concerning K.P.'s passive stance on parenting—he had not investigated S.I.L.'s medical, psychological or educational needs. He had instead allowed the grandfather to play the active parental role and K.P. took the attitude of "whatever [S.I.L.] wants" would be fine with him. Hilmoe understood S.I.L. had grown less interested in spending time establishing a relationship with K.P. and believed it was because there was a lack of predictability in that relationship. Hilmoe described S.I.L. as needing predictability because of the trauma she experienced in her mother's care. This predictability would help her feel mentally healthy and allow her to see her world as an ordered, rather than disordered, place. She opined that placing S.I.L. with a parent with whom she has no bond and no assurance of stability would be detrimental to her development.

K.P. admitted that he had told a Department social worker that he was not able to care for S.I.L., but testified that he had changed his mind. He pointed to the fact that he had been involved in S.I.L.'s care until she was three, including efforts to feed her, clothe her, and change her diapers. He visited A.L. and their daughter after work many days each week, went to the store to buy whatever S.I.L. and her mother needed, and mowed their lawn and washed their dishes. And he noted that he had a room in his current home where S.I.L. could have her own bedroom.

But K.P. was not aware of the extent of S.I.L.'s needs relating to her mental health or schooling. While he approved of the placement with her maternal grandfather and wanted to let S.I.L. decide where she wanted to live, he wanted the opportunity to rebuild a relationship with her. K.P. requested that S.I.L.'s time with the grandfather be considered a non-dependency placement with a relative.

S.I.L., through her attorney, joined the Department's request for a finding of dependency, arguing that the best way to ensure S.I.L.'s safety while trying to facilitate a bond and relationship between her and K.P. was within the structure, protection, and services provided by a dependency.

The court found S.I.L. a dependent under RCW 13.34.030(6)(c). The court ordered K.P. to undergo a psychosexual evaluation, but the court agreed to revisit that requirement if K.P. was able to subsequently produce a copy of his prior psychosexual evaluation. There is no evidence in the record of K.P. having produced this document.

K.P. appeals.

ANALYSIS

Sufficiency of Evidence of Dependency

K.P. first contends there is insufficient evidence to support the court's finding of dependency. In a dependency proceeding, the Department must prove that a child is dependent by a preponderance of evidence. RCW 13.34.110(1). We will affirm an order of dependency as long as substantial evidence supports the trial court's findings of fact and those findings support its conclusions of law. *In re Dependency of M.S.D.*, 144 Wn. App. 468, 478, 182 P.3d 978 (2008). We defer to the trier of fact on issues of conflicting testimony, credibility of the

witnesses, and the weight or persuasiveness of the evidence. *In re Welfare of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011). We view the evidence and all reasonable inferences in the light most favorable to the prevailing party. *In re Parental Rights to M.J.*, 187 Wn. App. 399, 407, 348 P.3d 1265 (2015) (citing *Woody v. Stapp,* 146 Wn. App. 16, 22, 189 P.3d 807 (2008)).

The court determined that S.I.L. is dependent under RCW 13.34.030(6)(c). This statute provides that a "[d]ependent child" is any child who "[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development."

K.P. assigned error to several of the trial court's factual findings that supported its dependency determination. He first challenges finding of fact 2.2.A, which states:

> In determining that the Department established by a preponderance of the evidence that [K.P.] is incapable of adequately caring for [S.I.L.] and her needs, the Court conducted a fact-specific inquiry and considered the evidence presented under the totality of the circumstances.

K.P. appears to argue that the trial court did not consider the totality of the evidence, but instead focused exclusively on the fact that "the father and child do not know each other very well and on the father's seven-year-old voyeurism conviction (which did not involve this or any child)." The record does not support this argument.

In its oral ruling, the trial court made clear that it considered the evidence of S.I.L.'s special needs including her mental health and academic delays, the current lack of a bond between S.I.L. and her father, the overall history of their relationship,

K.P.'s knowledge of A.L.'s mental health issues, his failure to follow through on a parenting plan for his son, his lack of intervention on S.I.L.'s behalf after discovering A.L.'s mental illness and its impact on her parenting, and the entire context of KP's criminal history, including a sex offense involving an individual who was 19 or 20, and his most recent DUI conviction. The court repeatedly stated that any individual circumstance may not suffice, but the court had to consider all of these factors in context. This oral ruling provides sufficient evidence to support the trial court's finding that it conducted a fact-specific inquiry based on the totality of the circumstances.

K.P. next challenges finding of fact 2.2.C, which states:

[S.I.L.]'s needs also include the need for a bond with her father. [S.I.L.] lacks a bond with [K.P.]. The facts and context that led up to this lack of bond and how it affects [S.I.L.] is important in determining whether [K.P.] is a capable parent. While [K.P.] was involved in [S.I.L.]'s life when she was young, this was followed by over a decade of little-to-no involvement.

The factual findings in this paragraph are also supported by substantial evidence. K.P. testified A.L. moved away with S.I.L. when S.I.L. was three years old and he admitted that "she doesn't know me . . . but she knows of me." He stated that he took A.L. and his daughter out for dinner when S.I.L. was ten years old. But he admitted he had not seen her any other time.

CPS social worker King testified that "[S.I.L.] has communicated to me at the beginning stages of this investigation that she would not know her father if she passed him on the street. So, clearly, there is no bond or attachment there." King also testified that a "bond and attachment is important in terms of . . . a parent or guardian wanting to be [protective], being empathetic and compassionate for the

child." The existence of a bond between parent and child is important, King said, in ensuring the child feels safe and feels comfortable reporting safety issues to that parent. King informed the trial court that her investigation revealed that K.P. had not been involved in parenting S.I.L.

Hilmoe similarly testified that there was no relationship between S.I.L. and her father. She stated that K.P. told her that they lacked any father-daughter bond. S.I.L.'s grandfather testified that S.I.L. does not know much about her father. There was ample evidence that, while K.P. was involved in S.I.L.'s life for the first three years, he had had no contact with her for a decade and lacked any bond with her.

K.P. next challenges finding of fact 2.2.D which states:

[K.P.] was involved in petitioning for a parenting plan in 2012 regarding [S.P.], his and [A.L.]'s older child. As evidence in the petition for parenting plan, [K.P.] knew [A.L.] had mental health issues while she was caring for [their children]. [K.P.] was also assaulted by [A.L.] during this time period. At trial, [K.P.] described his relationship with [A.L.] as being difficult. Despite his knowledge of [A.L.]'s unstable mental health and her combative behavior, [K.P.] did not follow-through on entering a final parenting plan or engage in other intervention efforts to ensure the children's safety in their mother's care. This evidence provides context for the lack of bond between [S.I.L.] and [K.P.] and demonstrates that there is no parent capable of parenting [S.I.L.] now.

The testimony of K.P. himself supports most of these factual findings. K.P. admitted that his relationship with A.L. was "not good," that things at times did "get violent," and that A.L. threw items at him "maybe a dozen times." K.P. testified that once when A.L. tried to hit him, he restrained her by grabbing her wrist and that he went to jail for doing so "because she had a bruise." He also stated that

- 11 -

he had not had a physical altercation with A.L. since 2010. This evidence supports the finding that A.L. had assaulted K.P. and was combative with him.

K.P. further testified that he petitioned for a parenting plan for his son in 2012. In the petition itself, K.P. wrote in handwriting that "On May 10th 2012, I got a call from Thurston Co. CPS in regards to my son [S.P.] letting me know he was taken out of mother's custody case #12-7-00320-9, Thurston County Superior Court due to her mental state. See attached custody case." The trial court reasonably inferred from this statement that K.P. was aware of A.L.'s mental illness. While K.P. testified that he assumed the court awarded him custody of his son in 2012, he understood that the parenting plan action was dismissed by the court. He stated that he "never finished it. . . . It fell, you know, all the way through."

K.P. also testified that, while he thought about petitioning the court for a parenting plan for S.I.L., he did not act on it because he did not want her to grow up in an environment "where the two parent[s] are gabbing at each other." Again, from this evidence, the trial court could infer that K.P. took no action to intervene to ensure that the children were safe in their mother's care.

K.P. next challenges the factual sufficiency of finding of fact 2.2.E which states:

> While passive parenting can be competent parenting in certain circumstances, it is not in the context of this case given [K.P.]'s lack of intervention while [S.I.L.] resided with [her mother] and [S.I.L.]'s own mental health needs. Passive parenting is a factor that demonstrates that [K.P.] is incapable of meeting [S.I.L.]'s needs.

This finding is supported by the testimony of the CPS social worker King, and GAL Hilmoe. King explained how traumatic the incident with her mother stabbing the mattress was for S.I.L. She testified that SIL did not feel safe in her mother's care.

Hilmoe testified that S.I.L. had special mental health and educational needs because of this trauma, her history of suicidality, and the delays in her academic progress. K.P. told her that he "wanted the best for his daughter but that he wanted her to make the decisions . . . about where to live." In her opinion, his attitude of wanting to do whatever S.I.L. thought was best and consenting to her placement with her grandfather was inadequate to meet S.I.L.'s special needs. She felt S.I.L. needed a parent who understood she was a teenager who had had a fairly tumultuous recent past; S.I.L. needed a parent who would be an active advocate in addressing her mental health needs and an active advocate regarding S.I.L.'s Individualized Education Program at school. Hilmoe pointed out that she had asked K.P. to become more engaged with his daughter and to request supervised visits with her. But he was deferring to her to make her own day-to-day decisions, including whether to spend time with him, and was not involved at all in monitoring her day-to-day activities, like the friends with whom she was spending time. This evidence is sufficient to support finding of fact 2.2.E.

K.P. next challenges finding of fact 2.2.F and 2.2.G and the court's ultimate finding of fact on the statutory basis for dependency under Paragraphs 2.3, 2.4, 3.4, and 4.1. Findings of fact 2.2.F and 2.2.G provide:

> 2.2.F. The Court considered [K.P.]'s criminal history as a factor in determining that he is incapable of parenting [S.I.L.]. [K.P.]'s criminal convictions of Voyeurism and Indecent Exposure are both sexual in nature and involve female victims in their early 18-20's. [K.P.] also has a DUI conviction that he is currently on probation for. While the DUI itself is not indicative of whether [K.P.] is able to adequately care for [S.I.L.], the fact that [he] admitted he was also intoxicated during the circumstances that led to the Voyeurism and Indecent Exposure convictions is concerning as it relates to [S.I.L.]'s safety. In context, and given [S.I.L.]'s age and vulnerability, this criminal history is a factor that demonstrates [K.P.] is incapable of caring for [S.I.L.].

2.2.G. The evidence at trial regarding [S.I.L.]'s needs, the lack of bond between [S.I.L.] and [K.P.], and [K.P.]'s criminal history, together, demonstrate that [K.P.] is incapable of caring for [S.I.L.] such that she is in circumstances which constitute a danger of substantial damage to her psychological or physical development.

Paragraphs 2.3, 2.4, 3.4 and 4.1 each make the same finding—that S.I.L. is dependent under RCW 13.34.030(6) because she lacks a parent capable of adequately caring for her such that she is in circumstances which constitute a danger of substantial damage to her psychological or physical development.

Each of these findings is supported by the testimony of Sharon, Hilmoe, King, and even K.P. himself. Sharon identified S.I.L.'s prior mental health and academic challenges. He explained that she had achieved stability and predictability with her grandfather and that moving S.I.L. into her father's care would jeopardize these improvements because S.I.L. had no bond with K.P. Sharon identified very real concerns about K.P.'s criminal history, what appears to be a pattern of alcohol abuse, and his lack of parental judgment when he engaged in voyeurism with his teenage stepdaughter.

Hilmoe opined that K.P. lacked the ability to meet S.I.L.'s special mental health and academic needs. Hilmoe testified that K.P. took no active role in parenting SIL nor had he investigated her medical, psychological or educational needs. Because of the trauma she experienced in her mother's care, S.I.L. needs predictability in order to feel safe and to succeed. Hilmoe opined that placing S.I.L. with K.P., a parent with whom she has no bond, would be detrimental to her development.

K.P. admitted his criminal history, including the voyeurism conviction, and gave a somewhat bizarre explanation for his conduct. Many of the convictions appear to stem from K.P.'s use of alcohol, for which he has no recollection of ever undergoing evaluation or treatment, despite a court order requiring that he do so.

This evidence is more than sufficient to support findings of fact 2.2.F and 2.2.G and the finding that S.I.L. is dependent. We therefore reject K.P.'s challenge to the sufficiency of the evidence.

<u>Psychosexual Evaluation</u>

K.P. next challenges the trial court's dispositional order to the extent it requires him to undergo a sexual deviancy evaluation.[1] He argues that the trial court abused its discretion by failing to make it clear that his evaluation need not include a polygraph or PPG test. K.P. further contends that imposing a psychosexual evaluation involving polygraph testing or PPG testing violates his right to substantive due process. But K.P. did not raise this issue below and, as the Department points out, the dispositional order does <u>not</u> require that K.P. undergo such tests.

Paragraph 4.5 of the order provides:

FATHER SHALL:

<u>SERVICE REQUIREMENTS</u>

. . .

2.      Complete a sexual deviancy evaluation with a Department-approved provider and follow any recommendations for further services. Contact the Department to request a referral be made for

---

[1] Both K.P. and the Department interchangeably refer to this evaluation as a sexual deviancy evaluation or a psychosexual evaluation. The record does not establish that there is a difference between the two.

the evaluation. The father may file a timely motion to strike this service requirement if a previous sexual deviancy evaluation is produced.

The juvenile court has broad discretion in dealing with child welfare matters, and we review dispositional orders in dependency cases for abuse of discretion. *In re Dependency of D.C.-M.*, 162 Wn. App. 149, 158, 253 P.3d 112 (2011). The juvenile court abuses its discretion when a decision is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. *In re Dependency of T.L.G.*, 139 Wn. App. 1, 15, 156 P.3d 222 (2007). K.P. contends that the trial court here abused its discretion, not by ordering a psychosexual evaluation per se, but by not explicitly excluding any requirement that he undergo either a polygraph examination or a PPG test. He contends there is no statutory authority to order a parent to undergo either test in a dependency proceeding.

First, we can find no indication that K.P. raised a statutory argument below. We will not address an argument for the first time on appeal unless the party can show the presence of a manifest error affecting a constitutional right. RAP 2.5(a)(3). K.P.'s statutory challenge does not fall within RAP 2.5(a)(3).

Second, the underlying premise of K.P.'s constitutional arguments is that the trial court ordered him to undergo a polygraph and a PPG test. But the dispositional order refers to neither, and the Department contends that the trial court's order does not include such requirements. There is no evidence in the record to support the assertion that a polygraph or a PPG test is "always" a component of a psychosexual evaluation. We will not address on appeal a

theoretical constitutional claim when there appears to be no actual dispute between the parties over the order's requirements.[2]

Finally, this dependency proceeding is ongoing. Dependency proceedings are remedial, preliminary, and nonadversarial in nature. *In re Welfare of Key*, 119 Wn.2d 600, 609, 836 P.2d 200 (1992). In the event the Department or an evaluator subsequently recommends that K.P. undergo either a polygraph or a PPG test, and what is now hypothetical becomes a reality, K.P. has the opportunity to raise the statutory and constitutional arguments with the trial court.

Affirmed.

_Andrus, C.J._

WE CONCUR:

_Colur, J._          _Smith, A.C.J._

---

[2] K.P. relies on Division Two's decision in *D.C.-M.*, 162 Wn. App. 149, for his request that the case be remanded to the trial court to make a record as to the basis for ordering a polygraph and PPG test. In that case, the mother explicitly objected to the trial court's order requiring she undergo these tests as a part of any psychosexual evaluation because the evaluation was to investigate the factual basis for her children's allegations of sexual abuse. *Id.* at 156. Although unclear, it appears the Department sought these very tests, and the trial court overruled the mother's objections to them. *D.C.-M.* is clearly distinguishable because K.P. did not raise this issue below and the Department is not asking that K.P. undergo such tests. The trial court here did not make a record to support ordering these two tests because it did not do so.