**FILED**
**APRIL 10, 2025**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 40404-8-III |
| | ) | |
| | ) | |
| C.M.P.,[†] | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

COONEY, J. — C.M.P., a minor child, was found to be dependent and placed in

out-of-home care pending a disposition hearing after being choked by J.P. (Father), his

father. Following the disposition hearing, C.M.P. was placed in out-of-home care based

on the court's concerns that C.P. (Mother), C.M.P.'s mother, was unable to protect

C.M.P. from Father or expel Father from her home. Mother appeals, arguing the court

---

[†] To protect the privacy interests of C.M.P., we use a pseudonym throughout this opinion. Gen. Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses*, (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_ trial_courts/?fa=atc.genorders_orddisp& ordnumber=2012_001&div=III.

should have issued an order protecting C.M.P. from Father and returned C.M.P. to her home. Mother also argues the court erred in ordering her to participate in domestic violence victims' services. C.M.P. argues the trial court erred in placing him in out-of-home care. We disagree with Mother's arguments, affirm the trial court, and decline to address C.M.P.'s arguments because he failed to file a notice of appeal.

## BACKGROUND

Mother and Father are the parents of 16-year-old C.M.P. C.M.P. has been diagnosed with autism, attention deficit hyperactivity disorder, post-traumatic stress disorder, anxiety, and depression and is enrolled in special education classes. Mother was involved in a serious car accident in 2021 or 2022 that left her paralyzed from the waist down. The Department of Children, Youth, and Families (Department) was aware of the family prior to this dependency due to "a previous dependency action through Idaho [Child Protective Services]." Clerk's Papers (CP) at 303.

In October 2023, C.M.P. was living with Mother in subsidized housing that she obtained with a housing voucher. Father, who has a history of "28 felonies and 78 misdemeanors with nearly 10 years of incarceration," also began living with Mother and C.M.P. after he was released from prison. CP at 8, 84.

On November 8, 2023, C.M.P. called law enforcement and stated that Father was "trying to hurt his mother and him." CP at 301. C.M.P. told law enforcement that Father had "pinned him down on top of his bed and was choking him." CP at 302. C.M.P. also

reported that "there is a long history of domestic violence in the home." CP at 301. Both parents told responding officers that C.M.P. has a history of self-harm, and Father was trying to restrain C.M.P. to prevent C.M.P. from hurting himself, not hurt C.M.P. Law enforcement took C.M.P. into protective custody because he reported he did not feel safe at home with his parents.

The next day, a Department caseworker met with the parents. Both parents reported C.M.P. "was out of control and participating in self-harming behaviors," and that Father had to physically restrain C.M.P. to prevent him from hurting himself. CP at 4. Father also told the caseworker that C.M.P. "punched him in the head 20 times and head butted him, resulting in his nose bleeding and being covered in blood." CP at 4. However, the caseworker observed no bruising or indication of injury on Father's face. The parents also reported that C.M.P. easily became "assaultive and aggressive," and that he was "manipulative and is not an accurate historian." CP at 5.

C.M.P. participated in a child forensic interview. During the interview, C.M.P. reported that Father "drinks a bottle of whiskey a day," and that he puts C.M.P. through "training" by choking him multiple times a day. CP at 302. C.M.P. reported that he heard Father threaten Mother on the day of the incident; a confrontation between C.M.P. and Father ensued that resulted in Father choking C.M.P., and C.M.P. calling law enforcement.

A few days later, the Department set up a "Family Team Decision Meeting" (FTDM). CP at 304. Prior to the FTDM, the Department explored different options for how C.M.P. could be returned to Mother's care. One option was having Mother obtain a protection order against Father.

A caseworker, C.M.P., Mother, Father, C.M.P.'s school psychologist, C.M.P.'s teacher, and C.M.P.'s aunt attended the FTDM. The Department had attempted to hold separate meetings for Mother and Father due to concerns of "long standing domestic violence," but Mother insisted Father attend as her support person. CP at 304, 6. At the FTDM, both parents claimed C.M.P. was the aggressor during the choking incident involving Father, and that C.M.P. was "assaultive" and "highly manipulative." CP at 304. However, C.M.P.'s aunt, psychologist, and teacher reported they had never experienced C.M.P.'s assaultive behavior, and they did not think his "manipulative behaviors" were any worse "than any other normal teenager." CP at 7, 304.

During the FTDM, the Department considered the protection order option but determined it would not be a safe choice for returning C.M.P. to Mother's care because it seemed unlikely she would enforce it. C.M.P. "expressed he felt that his mother would say she would do the work to [obtain a protection order], but would not actually follow through with it." CP at 304-05. C.M.P. reported he did not feel safe in Mother's care and did not feel she could keep him safe with Father out of prison. The Department noted that Mother made confusing statements about whether Father was actually residing

4

in her home, and she "did not identify other living options for [Father] and [Mother] would not clarify her plans for future housing options with or without [Father]." CP at 7. The Department also noted that policies from Mother's housing voucher and her housing complex "will not allow [Father] to remain living in the home with her" but that she is "adamant that [Father] is not living there but is staying there for the time being."[1] CP at 8.

Additionally, C.M.P. reported at the FTDM that "he often hears his father yelling at his mother, which makes her cry." CP at 7. The Department noted, "this is a clear sign of domestic violence with control and manipulation which [Mother] adamantly denies is occurring in her relationship with [Father]." CP at 7.

The Department filed a dependency petition due to the Department's concerns about the parents' lack of accountability and shifting blame to C.M.P. regarding the choking incident. The Department sought out-of-home placement for C.M.P. due to Father's physical abuse and Mother's failure to protect C.M.P. from Father. Following a shelter care hearing, the court ordered C.M.P. be removed from Mother's home and ordered supervised visits with the parents. The court held 30-day shelter care review

---

[1] It appears Father's felony convictions made it difficult or impossible for him to be included on Mother's lease. "[Father] is attempting to get his prior felonies erased from his record so that he can either be included on [Mother's] lease, or they can find a place of their own." CP at 84.

hearings in December 2023, January 2024, and February 2024 while continuing C.M.P.'s out-of-home placement. The caseworker involved during shelter care referred Mother to a domestic violence victims' advocacy program, and Mother indicated she would get into contact with their advocates. The caseworker was unsure whether Father was residing with Mother because Mother remained vague about their future housing plans. The caseworker noted the family's intention was "to remain together to become an in-tact [sic] family again." CP at 84.

At the December 2023 shelter care review hearing, the court chose to maintain out-of-home placement for C.M.P. based on a report of a verbal altercation that had occurred between him and the parents during a recent visit. During the visit at issue, C.M.P. had a verbal disagreement with his parents, and the visit facilitator ended the visit early because she "felt she could not assure [C.M.P.'s] safety, nor her own." CP at 220. A second visit facilitator was added to visits for the next month.

In January 2024, Father was briefly incarcerated due to a positive test for methamphetamine. Father also admitted to his Department of Corrections officer that he had been using methamphetamine.

At the January 2024 shelter care review hearing, the court again declined to return C.M.P. to his parents' home, citing Mother's inability to protect C.M.P., Father's use of physical force on C.M.P., and Father's drug use.

Then, in late January, another verbal altercation occurred between C.M.P. and his parents at a supervised visit. The parents alleged that C.M.P. was the aggressor, and that he "punched [Father] in the face and then pushed him over the sofa, which caused the TV to topple over." CP at 221. Contrarily, the visit facilitator noted Father was the aggressor, and that she did not witness C.M.P. punch Father in the face. C.M.P. refused to visit his parents after this incident.

At the February 2024 shelter care review hearing, the court again maintained C.M.P.'s out-of-home placement. C.M.P. requested that visits with his parents resume so long as they remained supervised, and visits with the parents recommenced in mid-February.

During a supervised visit in late February 2024, Father took C.M.P. to another room and instructed him to "'say in Court I didn't choke you, you better say that.'" CP at 250. C.M.P. again requested that visits be suspended following this incident, and the court therefore suspended visits.

In March 2024, the parents agreed C.M.P. was dependent pursuant to RCW 13.34.060(6)(c). The parents agreed upon certain facts including that:

> [T]he child cannot be safely reunified with his parents at this time without services for both the child and the parents due to the extended strained relationship between them. The allegations of physical abuse [by Father] towards the child and the child's confirmation of the father obstructing his airway with his hands, father's untreated substance use, the child's resistance to going back into the home, including his statements of not feeling safe in the care of his parents, the mother's reluctance to remove the

7

father from the home and her limitations based on her physical disabilities to protect the child.

CP at 276. C.M.P. was therefore found to be dependent, and supervised visits were reinstated shortly thereafter.

About a week prior to the disposition hearing, Father told a caseworker that "'you need to tell the judge that [C.M.P.] should return home.'" CP at 314. The caseworker stated Father "expressed this not as a request, but rather as a demand." CP at 314. The caseworker perceived Father's tone during this interaction to be "aggressive and somewhat menacing." CP at 314.

The court later held a disposition hearing. C.M.P. expressed a desire to return home at the disposition hearing. A protection order was briefly mentioned at the hearing by Mother's attorney when he explained that when Mother was told by the domestic violence victims' advocacy service that "they just do protection orders" when she reached out to them. Rep. of Proc. (RP) at 12. Because of this, Mother objected to the court's order to participate in their programming. Her attorney asserted the "family does not suffer from abuse." RP at 12.

The Department's position was that the domestic violence victims' advocacy program was necessary for Mother because "her parental deficiency is more specifically the failure to protect," and the Father used "manipulation" tactics on her. RP at 15-16. Specifically, the Department noted, "mom could have had this child—could have had

[C.M.P.] home from the very beginning," but she allowed Father to stay in her home,

despite not being allowed to reside there, and put "his needs above her own."  CP at 15.

At the conclusion of the disposition hearing, the court found "clear, cogent,

and convincing evidence that a manifest danger" existed such that C.M.P. would

"suffer serious abuse or neglect if not removed from the home, and that an order" under

RCW 26.44.063 would not protect C.M.P. from danger.  CP at 329.  Namely, the court

found:

> 2.2.14 Court finds that, pursuant to RCW 13.38.130, that reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and that services have been offered or provided and have failed to prevent the need for out of home placement and the Court finds by clear, cogent, and convincing evidence that a manifest danger exists and that the child will suffer serious abuse or neglect if the child is not removed from the home and an order under RCW 26.44 would not protect the child from danger.

> 2.2.15 The Court further finds and recognizes that the mother could have the child returned more quickly to her care should she wish to separate from the father or remove him from the home, but she has chosen to keep the father in the home despite the child being removed. As the court found at shelter care, the court could not safely place [C.M.P.] with [Mother] with a Protective Order due to the fact that [Mother] was not likely to enforce the order to keep [C.M.P.] safe. [Mother] insisted on [Father] being at the FTDM as her support person, minimized [Father's] responsibility in the choking incident even in front of [C.M.P.] at the FTDM, and continues to allow [Father] to stay in her home. [Mother] is in need of re-contacting Sage (domestic violence provider) and complying with an assessment and any recommended treatment. [Father] is still in need of additional counseling.

9

CP at 329-30. The court therefore ordered that C.M.P. "should be placed or remain in the custody, control, and care of [the Department]" and be placed in licensed foster care because it "is currently contrary to the child's welfare to return home." CP at 331.

The court also found the Department "made reasonable efforts as well as active efforts to prevent or eliminate the need for removal of the child from the child's home; but those efforts were unsuccessful because: [t]he health, safety, and welfare of the child cannot be adequately protected in the home." CP at 332. Finally, the court ordered Mother to engage in domestic violence victims' treatment.

Mother timely appeals.[2]

## ANALYSIS

WHETHER THE COURT ERRED WHEN IT DID NOT PLACE C.M.P. WITH MOTHER FOLLOWING THE DISPOSITION HEARING

Mother and C.M.P. argue the court erred when it placed C.M.P. in out-of-home care following the disposition hearing. Mother asserts she posed no threat to C.M.P.'s health, welfare, or safety, and a protection order excluding Father from the home would have sufficiently protected C.M.P. C.M.P. argues the court did not consider the negative impact removal from the home would have on him when making its placement decision,

---

[2] C.M.P. also filed a brief in this matter but, as discussed below, he did not file a notice of appeal.

and that the Department did not make reasonable efforts to prevent the need for removal. We disagree with Mother and C.M.P.

"Parents have a fundamental liberty interest in the care and welfare of their minor children." *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). The State often has a competing interest in protecting a child's physical, mental, and emotional health. *Id.* at 941-42. When a child's mental or physical health is endangered by parental deficiencies, "the State has a parens patriae right and responsibility to intervene to protect the child." *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980). The legislature declared that "the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized." RCW 13.34.020.

The juvenile court has broad discretion in dealing with matters of child welfare, and we therefore review orders issued in a dependency case for abuse of discretion. *In re Dependency of R.W.*, 143 Wn. App. 219, 223, 177 P.3d 186 (2008). A court abuses its discretion if its decision is based on untenable grounds or reasons. *In re Dependency of B.F.*, 197 Wn. App. 579, 586, 389 P.3d 748 (2017).

Challenged findings of fact are reviewed for substantial evidence. *Schermer*, 161 Wn.2d at 940. "Substantial evidence exists if, when viewing the evidence in the light most favorable to the prevailing party, a rational trier of fact could find the fact more

likely than not to be true." *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013). We will not reweigh evidence or reassess witness credibility on appeal. *Id.*

Mother contends the court should have issued a protection order protecting C.M.P. from Father and placing C.M.P. back in her home. The State responds that the court did not err in placing C.M.P. outside the home because it properly concluded a protection order against Father would not have obviated the risk of harm to C.M.P. because Mother would not have enforced it. We agree with the State.

Following a disposition hearing, the court may order the child be placed either in their parent's care or in out-of-home care. RCW 13.34.130(1). If the court places the child in out-of-home care, it must determine the Department made "reasonable efforts" to prevent or eliminate the need for the child's removal. RCW 13.34.130(6). The court must also find:

> (a) There is no parent or guardian available to care for such child;
>
> (b) The parent, guardian, or legal custodian is not willing to take custody of the child; or
>
> (c) … by clear, cogent, and convincing evidence, a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home and an order under RCW 26.44.063[3] would not protect the

---

[3] RCW 26.44.063(5), titled, "Temporary restraining order or preliminary injunction—Enforcement—Notice of modification or termination of restraining order" states, in relevant part:

> The court shall issue a temporary restraining order prohibiting a person from entering the family home if the court finds that the order would eliminate the need for an out-of-home placement to protect the child's right to nurturance, health, and safety and is sufficient to protect the child from

child from danger. The court shall give great weight to the lethality of high-potency synthetic opioids and public health guidance from the department of health related to high-potency synthetic opioids, including fentanyl, when deciding whether a manifest danger exists.

RCW 13.34.130(6)(a)-(c).  Here, C.M.P. was placed outside the home following the disposition hearing.

Mother challenges the findings of fact in sections 2.2, 2.2.14, 2.2.15, and 2.3. These findings are supported by substantial evidence, and the court did not abuse its discretion in placing C.M.P. outside the home.

In section 2.2, the court found, "It is currently contrary to the child's welfare to return home," and that C.M.P. should be placed with another suitable person because "the court finds by clear, cogent, and convincing evidence that a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home, and an order under RCW 26.44.063 will not protect the child from danger."  CP at 331-32.  Relatedly, the court found in finding 2.2.15 that "the mother could have the child returned more quickly to her care should she wish to separate from the father or remove him from the home, but she has chosen to keep the father in the home despite the child being removed."  CP at 329-30.  Further, the court found in finding 2.2.15 that "the court could not safely place [C.M.P.] with [Mother] with a Protective Order due to the fact that

further sexual or physical abuse or coercion.

[Mother] was not likely to enforce the order to keep [C.M.P.] safe." CP at 330. The court noted in finding 2.2.15 that Mother insisted Father attend the FTDM and minimized Father's responsibility in the choking incident.

Mother also challenges findings 2.3 and 2.2.14. Finding 2.3 reads, in relevant part, the Department "made reasonable efforts as well as active efforts to prevent or eliminate the need for removal of the child from the child's home, but those efforts were unsuccessful because: [t]he health, safety, and welfare of the child cannot be adequately protected in the home." CP at 332. Relatedly, the court found in finding 2.2.14 that, pursuant to RCW 13.38.130, "reasonable efforts have been made to prevent or eliminate the need for removal of [C.M.P.] from [his] home and that services have been offered or provided and have failed to prevent the need for out-of-home placement." CP at 329. The court therefore found "by clear, cogent, and convincing evidence that a manifest danger exists and that [C.M.P.] will suffer serious abuse or neglect" if not removed and that an "order under RCW 26.44 would not protect [C.M.P.] from danger." *Id*. The court's findings are supported by substantial evidence.

Mother never requested a protection order before the trial court nor indicated a willingness to enforce one. To the contrary, Mother's past conduct, as noted in finding 2.2.15, demonstrated that she was unable or unwilling to expel Father from the home.

Specifically, Mother, at the first FTDM, invited Father to be her support person despite the Department scheduling separate meetings for the parents. Further, at the

14

FTDM, C.M.P. expressed his concern that Mother would "not actually follow through" with obtaining or enforcing a protection order against Father. CP at 304-05. Additionally, Father was not allowed to reside in the home because Mother was using a housing voucher. However, when Mother was asked what the plan for "safe and stable housing" for Father was, she identified no alternate arrangements, and the Department suspected her plan was "to continue to reside with [Father], placing her housing at risk." CP at 11. Throughout the dependency, Mother's objective was clearly to keep the family together. At the FTDM, Mother also minimized the choking incident by stating C.M.P. was the "aggressor," and that he is "highly manipulative" and "assaultive." CP at 304. However, other individuals at the meeting, including C.M.P.'s teacher and aunt, did not agree that C.M.P. was manipulative or assaultive.

Further supporting the court's findings are the agreed upon facts in the "Order of Dependency and Disposition." CP at 272. Namely, that "the mother's reluctance to remove the father from the home and her limitations based on her physical disabilities to protect" C.M.P., prevented him from being reunified with his parents. CP at 276. This fact was stipulated to by the parents. Additionally, at the disposition hearing, Mother stated through her attorney that she objected to doing domestic violence victims' treatment because she was told the provider only did protection orders, which she was uninterested in obtaining.

Mother now asserts a protection order under RCW 26.44.063 would have been sufficient to obviate the risk of harm to C.M.P. But, as the court noted, Mother was unlikely to enforce such an order evidenced by her unwillingness to separate from Father or remove Father from her home. The court's findings are supported by substantial evidence. The court did not abuse its discretion in deciding to place C.M.P. outside of the home.

C.M.P. argues that the court abused its discretion by placing him outside the home. He contends the court "did not consider the devastating effect of removing C.M.P. from his family and placing him in foster care." Br. of Appellant (Child) at 3.[4] Additionally, C.M.P. argues there was insufficient evidence to support the court's finding that the Department made reasonable efforts to prevent the need for removal of C.M.P. from the home. We decline to address these arguments because C.M.P. did not file a notice of appeal.

"[A] party must file a timely notice of appeal to be entitled to relief." *Genie Indus., Inc. v. Mkt. Transp., Ltd.*, 138 Wn. App. 694, 707, 158 P.3d 1217 (2007). Our Supreme Court has characterized the timely filing of a notice of appeal as a jurisdictional step in perfection of an appeal. *See Mackey v. Champlin*, 68 Wn.2d 398, 399, 413 P.2d

---

[4] C.M.P.'s brief was incorrectly filed as a "Respondent's Brief." The brief was accepted as a brief for a minor child in lieu of refiling.

340 (1996). A notice of appeal must "(1) be titled a notice of appeal, (2) specify the party or parties seeking the review, (3) designate the decision or part of decision which the party wants reviewed, and (4) name the appellate court to which the review is taken." RAP 5.3(a). We will disregard the defects in the form of a notice of appeal "if the notice clearly reflects an intent by a party to seek review." RAP 5.3(f).

Here, C.M.P. did not file a notice of appeal, and there is no indication in Mother's notice of appeal that C.M.P. was also a party seeking review. Mother is the only appealing party listed on the notice of appeal. Because C.M.P. did not file a notice of appeal, his arguments are not properly before this court, and we decline to address them.

WHETHER THE COURT ERRED WHEN IT ORDERED MOTHER TO ENGAGE IN DOMESTIC VIOLENCE VICTIMS' TREATMENT

The mother argues the court erred when it ordered her to engage in domestic violence victims' treatment. We disagree.

"The dependency statutes provide a broad framework from which the juvenile court may order services to facilitate parent-child reunification." *In re Dependency of D.C.-M.*, 162 Wn. App. 149, 158, 253 P.3d 112 (2011). RCW 13.34.025(2)(d) regarding provision of services states, in relevant part, "[t]his section . . . does not create judicial authority to order the provision of services *except for the specific purpose of making reasonable efforts to remedy parental deficiencies identified in a dependency proceeding*

17

*under this chapter.*" (Emphasis added.)  A trial court's decision to order a particular

service is reviewed for an abuse of discretion.  *D.C.-M.*, 162 Wn. App. at 158.

Mother objects to the services required in section 3.2 of the court's order of

disposition, namely, the domestic violence victims' treatment.  However, sufficient

evidence exists in the record to establish that Mother was a domestic abuse victim that

required remedying.  The court therefore did not abuse its discretion when it ordered

Mother to engage in a 10-week domestic violence victims' advocacy program.

Mother points to the fact that Father does not have any convictions for domestic

violence offenses.  However, convictions for domestic violence offenses are not the only

means of proving that domestic violence is occurring in the home.  Indeed, the record is

rife with evidence of domestic violence.  Here, evidence of Mother being a domestic

violence victim includes: C.M.P. telling the law enforcement officers who responded to

the choking incident that his "father was trying to hurt his mother and him" (CP at 301);

Father yells at Mother and makes her cry (CP at 7); a guardian ad litem report stating the

parents need to "remedy their primary parental deficiencies of ongoing domestic

violence" (CP at 258); and a caseworker's experience with Father after which she

described his tone as "aggressive and somewhat menacing" (CP at 314).  Domestic

violence was a primary issue throughout the pendency of this case.

Mother also argues that domestic violence victims' treatment would not help to

address a parental deficiency.  However, as discussed above, Mother's primary

No. 40404-8-III
*In re Dependency of C.M.P.*

deficiency was her failure to protect C.M.P. from Father. There are indications in the record that the domestic violence perpetrated against Mother impacted her ability to parent C.M.P., evidenced by her refusal or inability to remove Father from the home in order to facilitate reunification with C.M.P. The court did not abuse its discretion when it ordered Mother to participate in domestic violence victims' treatment.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Fearing, J.

_____
Staab, A.C.J.